**PUBLIC UTILITIES COMMISSION OF DISTRICT OF COLUMBIA**

**v.**

**CAPITAL TRANSIT CO. et al.**

**No. 12145.**

United States Court of Appeals District of Columbia Circuit.

Decided May 7, 1954.

Petition for Rehearing in Banc Denied May 20, 1954.

244

Mr. Lloyd B. Harrison, Asst. Corp. Counsel for the District of Columbia, for appellant. Messrs. Vernon E. West, Corp. Counsel, Chester H. Gray, Principal Asst. Corp. Counsel, and Lyman J. Umstead, Asst. Corp. Counsel, also entered appearances for appellant.

Mr. Edmund L. Jones, Washington, D. C., for appellee Capital Transit Co. Messrs. George E. Monk and Merle Thorpe, Jr., Washington, D. C., also entered appearances for appellee Capital Transit Co. Mr. George E. Hamilton, Washington, D. C., for appellee Union Trust Co. of District of Columbia. Mr. William A. Glasgow, Washington, D. C., also entered an appearance for appellee Union Trust Co. Mr. Hugh H. Obear, Washington, D. C., for certain stockholders, appellees. Mr. Godfrey L. Munter, Washington, D. C., for certain bondholders, appellees.

Before EDGERTON, WILBUR K. MILLER and FAHY, Circuit Judges.

FAHY, Circuit Judge.

On February 26, 1954, the Public Utilities Commission of the District of Columbia, appellant, by Order No. 4060, instituted an investigation into certain aspects of the operations of the Capital Transit Company, principal transportation utility in the District of Columbia. The Company operates under a Congressional franchise and is subject to detailed regulation in accordance with the provisions of Title 43 and Chapter 2 of Title 44, D.C.Code, 1951. The order of the Commission recited that the investigation would cover the action of the Company in transferring approximately $4,000,000 to the Union Trust Company for call of its bonds, the proposed distribution to stockholders of certain nontransit properties, the dividend policies and financial practices of the Company, and the adequacy of depreciation reserves and of provisions for future adverse contingencies. On February 27 the Commission filed its complaint in the District Court praying that (1) the payment on April 1, 1954, of a proposed quarterly dividend declared February 25, amounting to 40 cents per share, or $384,000, and (2) the redemption of all the Company's outstanding bonds, involving a disbursement of $3,910,277.17, be temporarily enjoined,

"* * * until the Public Utilities Commission has completed its investigation authorized by it on February 26, 1954, relating to the declaration and payment of dividends and the call for redemption of the said bonds." [1]

A temporary restraining order was issued and the case came before the District Court on the Commission's application for a preliminary injunction. After a full hearing the court issued its findings of fact and conclusions of law and denied a preliminary injunction, whereupon the Commission appealed to this court as authorized by 28 U.S.C. § 1292.

The Commission applied to us for an injunction pending the appeal.[2] We neither granted it as prayed nor denied

1. A permanent injunction was also sought, but the case in its present posture calls for a decision only with respect to the prayer for a preliminary injunction.

2. The District Court had in effect stayed its denial of a preliminary injunction until we could act.

it altogether, but enjoined the Company and other appellees[3] until April 26, 1954, extended thereafter to May 7, 1954, from going forward with the bond redemption and dividend payment, and requested the Commission to file a report with us on or before April 19, 1954, of whatever facts it had ascertained which might bear upon the injunction. The appellees were requested to reply to such report as early as possible.*

■ Our authority thus to enjoin appellees until May 7, 1954, is clear. Rule 62(g), Fed.Rules Civ.Proc., 28 U.S.C., makes plain that other provisions of Rule 62 which recognize the authority of the District Court to grant relief pending an appeal,

> " * * * do not limit any power of an appellate court * * * to suspend, modify, restore, or grant an injunction during the pendency of an appeal or to make any order appropriate to preserve the status quo or the effectiveness of the judgment subsequently to be entered."

This Rule, read with 28 U.S.C. § 1651, formerly § 377, known as the All Writs Statute, amply supports the authority we exercised. In Scripps-Howard Radio v. Federal Communications Commission, 316 U.S. 4, 9, 62 S.Ct. 875, 879, 86 L.Ed. 1229, it is said,

> "No court can make time stand still. The circumstances surrounding a controversy may change irrevocably during the pendency of an appeal, despite anything a court can do. But within these limits it is reasonable that an appellate court should be able to prevent irreparable injury to the parties or to the public resulting from the premature enforcement of a determination which may later be found to have been wrong. It has always been held, therefore, that as part of its traditional equipment for the administration of justice, a federal court can stay the enforcement of a judgment pending the outcome of an appeal. * * * *"[4]

The Court referred to the power as one "as old as the judicial system of the nation." 316 U.S. at page 17, 62 S.Ct. at page 883.

■ Our power being clear there remained the question whether it should be exercised, at least in part. Two principal reasons prompted us to do so, Circuit Judge Miller dissenting. The first was that otherwise the case would have become moot and our jurisdiction to review the order of the District Court would have been destroyed. We would have been confronted with a *fait accompli* because of the proposed timing of the bond redemption and dividend program. The appeal must be insubstantial indeed to cause us to stand aside and let the mere passage of a few days oust our jurisdiction of an appeal which has been brought to us. In the second place, the moving party in the litigation was the Public Utilities Commission of the District of Columbia, a governmental agency clothed by Congress with special responsibility in the matters involved.[5] The Commission sought the assistance of the courts to obtain time to investigate

---

3. Members of the Board of Directors of the Capital Transit Company, certain of the Company's bondholders and stockholders, and the Union Trust Company of the District of Columbia.

* Our order of March 29, 1954, on appellant's motion for an injunction pending appeal and the opinion of Circuit Judge Miller dissenting from that order are printed as an appendix following the majority and dissenting opinions on the merits of the appeal (infra, 94 U.S.App.D.C. ——, 214 F.2d 251).

4. The case involved the right of the Court of Appeals to stay an order of the Federal Communications Commission pending appeal, but the opinion discusses the subject in terms also of the power of the appellate court pending its review of a judgment of a lower court.

5. In a recent case we referred to the detailed powers and responsibilities of the Commission in the general area of utility regulation. Capital Transit Co. v. Safeway Trails, 92 U.S.App.D.C. 20, 201 F.2d 708.

matters directly related to the actions of appellees sought to be enjoined. Resort to the District Court for this purpose did not transfer to the court the Commission's own administrative responsibility of investigation and decision, which it had been unable fully to perform. In this situation, after balancing the equities on each side, discussed later in connection with our final decision, a compelling case was made for this court to preserve the status quo for a limited time. The findings of fact and conclusions reached by the court below were not at this point in the proceedings required to be accepted by us under the "clearly erroneous" or any other rule.[6] The granting or withholding of relief pending appeal turned primarily upon other factors. These were the probability of mootness, a regard for the responsibility of the Commission, and the absence of likelihood of significant injury to private as compared with public interests by reason of some delay. Scripps-Howard Radio v. Federal Communications Commission, supra, 316 U.S. at page 15, 62 S.Ct. 875; Yakus v. United States, 321 U.S. 414, 440–441, 64 S.Ct. 660, 88 L.Ed. 834. We accordingly entered our order of March 29, 1954, with its request that the Commission make a report by April 19, the appellees to reply as soon as possible. This was not designed to retry the factual issues in this court. However, additional factual data were acceptable on the separate application to us for relief pending appeal. It is common practice to receive additional information on such an application, in the form of affidavits or otherwise. That the information we invited was to come in part from the Commission as a result of its investigation did not render it less acceptable.

All parties have consented that we now finally dispose of the appeal, which obviates the need for further consideration of relief during its pendency. We accordingly come to the issue whether denial by the District Court of a preliminary injunction was erroneous, in whole or in part.

The complaint alleges that the Company has deposited with the Union Trust Company $3,797,000, plus call premium and accrued interest, making a total of $3,910,277.17, for the purpose of redeeming its bonds. Under the Indenture of Mortgage securing these bonds the Company may not, while any of the bonds are outstanding, pay a dividend on its common stock except from earned surplus accumulated subsequent to November 30, 1944, plus $120,000 accumulated prior thereto. All other is restricted. As of January 31, 1954, the remaining unrestricted earned surplus was only $89,536. That held under the Indenture restriction, however, was $3,153,721. The quarterly dividend declared February 25, 1954, to be paid April 1, amounted to $384,000, far more than the available unrestricted surplus from which it could be paid. It was necessary therefore to free the restricted surplus, $3,153,721, if the dividend was to be paid. This could be accomplished only by redeeming all the bonds, and the Company decided to do so.

In determining now whether we should require this proposed program to be enjoined beyond May 7, 1954, we are confronted with the fact that the special tribunal created by Congress with primary responsibility for the regulation of the Transit Company in the public interest has not completed its investigation into whether or not this program can be carried out consistently with the Company's legal obligations. The courts should be reluctant to take action which would deprive the Commission of opportunity to perform its function under governing statutes.[7] On the other hand, unless the Commission has shown

---

6. Rule 52(a), Fed.Rules Civ.Proc., lays down the general rule that the findings of fact of a district court shall not be set aside unless clearly erroneous and that due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.

7. " * * * 'Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance

some likelihood that the Company's conduct might interfere with its ability to meet its legal obligations, the courts should stand aside and permit management to carry out its decision. In deciding between these courses we must consider also the possible harm to appellees of further judicial restraint, and compare it with the possible public harm of removing all restraint. Scripps-Howard Radio v. Federal Communications Commission, supra; Yakus v. United States, supra. The case is not governed by the ordinary rules applicable to judicial interference in the conduct of a business enterprise. Utility companies operating under public franchises and having monopolistic characteristics are subject to special regulation. This is explicit in our statutory law, Title 43, D.C.Code, 1951, and is established as well in decisional law.

■ Concerning the question of possible harm, certain facts are undisputed. Disregarding a four for one split in its common stock it is undisputed that the Company, since January 1, 1950, has paid $29.00 in dividends on each share, or 145% of the $20.00 paid for each share by the present management. Moreover, the market value of the stock has greatly increased since 1950. It cannot seriously be asserted, therefore, that significant hardship to stockholders is likely to occur if the controverted quarterly dividend is delayed. The bonds do not mature until 1964. To redeem them now calls for a premium of $1.65 on each $100 of value. The clear inference is the decision to redeem was not to benefit bondholders or Company but to free earned surplus to enable dividends to be paid therefrom to stockholders. Never-

theless, though neither stockholders nor bondholders nor Company would be significantly injured by delay, judicial restraint is not justified unless there is legal basis for it.

■ Before discussing this we refer to the related subject of possible harm to the public unless further delay in the disbursement program is imposed. The Commission, not having completed its investigation, has reached no final decision as to what should be done. As we have said the Commission is the special agency created to perform in the first instance the relevant regulatory functions, and may make orders, subject to court review, to carry out its decisions. See Capital Transit Co. v. Safeway Trails, supra note 5, 92 U.S.App.D.C. at page 22, 201 F.2d at page 710. It contends in substance that the disbursement of $3,910,277.17 to redeem all outstanding bonds and of $384,000 for a quarterly dividend, as part of a program of total dividends during 1954 of $1,536,000, with revenues showing an unstable tendency, might result in depletion of the Company's liquid assets and working capital so that it could not maintain intact its capital devoted to the public service and adequately serve the community, and that the investigation will lead to some order within the Commission's statutory authority which would be rendered ineffective unless these disbursements are held in abeyance.

■ It seems to us that the slight likelihood of significant injury to appellees by delay is outweighed by possible public injury in disabling the Commission from effectively pursuing its responsibility.[8] But there must appear

---

of the public interest than they are accustomed to go when only private interests are involved.' Virginia Ry. Co. v. Federation, 300 U.S. 515, 552 [57 S.Ct. 592, 601, 81 L.Ed. 789]. * * * Courts and administrative agencies are not to be regarded a competitors in the task of safeguarding the public interest. United States v. Morgan, 307 U.S. 183, 190–91 [59 S.Ct. 795, 799, 83 L.Ed. 1211]; Federal Communications Commission v.

Pottsville Broadcasting Co., 309 U.S. 134 [60 S.Ct. 437, 84 L.Ed. 656]. * * * Both are instruments for realizing public purposes." Scripps-Howard Radio v. Federal Communications Commission, supra at page 15, 62 S.Ct. at page 882.

8. "* * * in construing a statute setting up an administrative agency and providing for judicial review of its action, court and agency are not to be regarded as wholly independent and unrelated in-

also a substantial basis for concluding that the investigation might lead to a valid order which would affect the bond redemption and dividend program.

■ The appellees contest the likelihood of the investigation leading to any such valid order. They rely largely upon the Company's condition as found by the court below. Assuming the factual correctness of the court's appraisal, the question is whether the healthy condition thus portrayed would continue if substantial amounts now carried as earned surplus were disbursed as dividends and the Company's working capital and cash position materially affected by redeeming immediately all outstanding bonds. It is undisputed the Company borrowed $1,500,000 from the American Security & Trust Company contemporaneously with its decision to take these steps. Counsel for the Commission argues that this loan, not having Commission approval under Paragraph Sixth of the Unification Agreement incorporated in the Merger Act, 47 Stat. 754,[9] is invalid. This question has not been determined by the Commission itself or by the District Court. Appellees say it is not before us and point to the absence of the lending bank as a party. We do not decide the question. The fact of the loan is undisputed conduct of the Company supporting the view that the program sought to be enjoined could not be completed in safety without the loan; else we are at a loss to understand it. The loan bears interest of 3.95%. The

bonds draw 4% interest, but in redeeming them now a premium must also be paid. These circumstances make the bond and loan transactions appropriate for Commission study. We are unable to conclude, however, that there is substantial likelihood the Commission validly can require a cancellation or modification of the bond redemption program. This is so because, aside from the new $1,500,000 loan, the redemption will practically free the Company of debt and its assets of liens.[10] The reduction now of liquid assets and working capital by the required outlay of nearly $4,000,000 might be unwise. But the money will be used to pay a bonded indebtedness; and the Commission is quite unlikely to be able to find that the immediate total redemption of all bonds is so improvident that it can be validly prohibited. This being so, this court should not require that it be enjoined. Good business administration might argue for a slower pace of redemption. But this hardly comes to saying that immediate redemption will render the Company unable to perform its responsibilities to the public, either at present or as the Commission hereafter might validly direct. Should need arise for additional cash the borrowing capacity of the Company, enhanced by elimination of the existing bonded indebtedness, would be available. Insofar, therefore, as our order of March 29, 1954, extended to May 7, 1954, enjoins the redemption of the bonds it will be allowed to expire and the denial by the

---

strumentalities of justice, each acting in the performance of its prescribed statutory duty without regard to the appropriate function of the other in securing the plainly indicated objects of the statute. Court and agency are the means adopted to attain the prescribed end, and so far as their duties are defined by the words of the statute, those words should be construed so as to attain that end through coordinated action. * * *" United States v. Morgan, 307 U.S. 183, 191, 59 S.Ct. 795, 799. See, also, note 7 supra.

9. The Merger Act of 1933, 47 Stat. 752, provided that street-railway corporations operating in the District might merge

into a single company to be called Capital Transit Company.

Paragraph Sixth reads:

"After the original issue of stock for the purposes of the unification, additional shares of stock and/or additional bonds or other evidences of indebtedness may, subject to the approval of the Public Utilities Commission of the District of Columbia, be issued by the Directors from time to time for cash or in payment for bonds, or property, or to reimburse the treasury for capital expenditures."

10. The loan agreement requires the Company to maintain unimpaired earned surplus in an amount not less than $1,500,-000.

District Court of the preliminary injunction against this aspect of the Company's program will be affirmed.

As to the proposed dividend we take a different view. The Commission represents the possible need of an addition to the depreciation reserve. If such a necessity should eventuate it would draw upon the amount now carried as earned surplus. If dividends are continued as contemplated they also must come from earned surplus and might render this account unable to cure a depreciation deficiency. The question of such deficiency has not been determined finally by the Commission. What its decision will be we do not know, or whether when made it would withstand judicial review.

The depreciation reserve has been maintained thus far in compliance with the orders of the Commission. But the Commission let it be known in January 1954 that while it then found no sufficient basis for change in this regard studies of the subject would continue. Then came the Company's unexpected February program of disbursements. What the Commission thought has apparently gone through reappraisal in the light of these events. This is not to be decried, for the regulatory responsibility of the Commission is a continuing one and necessarily must take account of changes in Company activities. In January 1954 the Company had decided to redeem only $2,000,000 of its bonds during 1954. In February 1954 it decided to redeem all, entailing an outlay of nearly $4,000,000. Between January 1, 1950, and January 31, 1954, the Company had declared and paid from surplus earned prior to January 1, 1950, dividends in the amount of $2,404,111 or a little more than $10.00 on each share.[11] In February 1954 an additional dividend was declared which contemplated total dividends for the year of $1,536,000. In

February the Company borrowed $1,500,-000. These were circumstances which immediately preceded the decision of the Commission promptly to institute an investigation and to seek judicial aid to preserve the status quo pending its completion.

While, for the reasons we have given, we think such aid was properly denied insofar as it would affect the bond redemption program, except as we enjoined it to May 7th pending our study, nevertheless, as to the proposed dividend payment, we think relief should be continued for the time being. In contrast with the general powers of the Commission upon which reliance would be placed to prohibit the bond redemption, should it be thought seriously to jeopardize the ability of the Company to perform its public obligations, the statute explicitly authorizes the Commission to control the accumulation of a depreciation reserve, §§ 43-315, 43-303, D.C.Code, 1951. Furthermore, this subject is intimately related to dividends, because dividends and depreciation reserve draw upon the same reservoir. This is not to say the Commission can control dividends as such, a matter we deem not involved. It is to say that in exercising its statutory authority with respect to depreciation, and perhaps in other respects less explicit, the Commission might find it necessary to make an order affecting funds which otherwise would be available for dividends. We see no escape from this.

We have set forth our view that the relative equities, the balancing of conveniences, may favor delay with respect to bond redemption as well as dividend payments. We grant none as to the former, however, because of the unlikelihood of availability of valid action by the Commission to prevent such redemption.[12] As to the latter the possibility of some valid action growing out

11. As hereinabove stated the total dividends during this period were $29.00 per share.

12. The unlikelihood of such valid Commission action does not rest in our opinion upon the contractual obligations which

are said to have arisen under the terms governing the bonds, coupled with the deposit made with the Trustee. Though the question need not be decided now, we think it probable that these obligations are subordinate to the regulatory provi-

of the pending investigation is not so insubstantial as to forestall the Commission. It should be permitted to pursue its administrative responsibilities before Company action is taken which might render Commission action ineffective even should it prove to be valid. The question of its validity would be subject to judicial review, under § 43–705, D.C. Code, 1951; see, also, § 43–204, and Capital Transit Co. v. Safeway Trails, supra note 5, and the result should not be anticipated in advance of Commission decision. Thereafter review could be initiated by an amendment in the District Court of the pleadings in the present suit, or in such other manner as might appear appropriate at the time.

 Our decision with respect to the dividend does not involve setting aside the basic factual findings of the District Court. We do depart in some degree, at this point in the proceedings, from two conclusional findings, Nos. 27 and 29.[13] These, reflecting the exercise of judgment and opinion on the part of the District Court, rather than the ascertainment of facts, may be more readily set aside under the "clearly erroneous" rule, referred to in note 6 supra. Standard Oil Development Co. v. Marzall, 86 U.S. App.D.C. 210, 214, 181 F.2d 280, 284. The more so in the present case because, in our view, the District Court does not have responsibility in the circumstances for the initial determination of such conclusional factual issues. We think it should have decided only, as we do, under the standards we have indicated, whether a sufficient basis has been presented by the Commission, legally as well as factually, to call upon the court to enjoin the proposed payments in whole or in part, pending fulfilment of the Commission's own initial responsibility of investigation and decision.

In nothing we have said do we intimate what decision the Commission should reach, nor do we attempt to delimit the scope of its investigation. We decide only that no case is made for a preliminary injunction against the bond redemption program; but that one is made for such an injunction against the quarterly dividend of 40 cents a share, which was to have been paid April 1, 1954, until the Commission is given a reasonable opportunity to decide in the first instance what if anything it validly may and should do affecting the surplus from which the dividend would be paid, and affecting the responsibilities of the Company in relation thereto and to its franchise obligations.

We accordingly remand the case to the District Court with directions that it modify its order of March 18, 1954, denying a preliminary injunction, or, if it prefers, set it aside and enter a new order, so that an injunction will issue, pending further order of the District Court, against the payment of the dividend heretofore declared and unpaid; that the Commission be required to complete its investigation under Order No. 4060, insofar as it would affect matters involved in this litigation, within a time fixed by the District Court, and within that time to make any order it determines to be right and proper under the law, the District Court in the meantime to retain jurisdiction of the cause. In other respects the order of the District Court denying the preliminary injunction is affirmed.

It is so ordered.

---

sions of the statute when they otherwise are validly invoked by the Commission. Union Dry Goods Co. v. Georgia Public Service Corp., 248 U.S. 372, 375–376, 39 S.Ct. 117, 63 L.Ed. 309.

13. They read:

"27. That the payment of a 40¢ dividend on the common stock of the Capital Transit Company on April 1, 1954, will not impair the company's capital or the ability of the company to furnish adequate service or to perform its public functions.

\* \* \*

"29. That the use of cash by Capital Transit Company for the purpose of redeeming its outstanding bonds and the payment of a dividend of 40¢ per share on April 1, 1954, will not impair the company's capital or its ability to perform its public function."

WILBUR K. MILLER, Circuit Judge (concurring in part and dissenting in part).

In dissenting from the order entered by the majority March 29, 1954,[1] which enjoined Capital Transit Company from redeeming its outstanding bonds and from paying the quarterly dividend of $384,000 declared February 25, 1954, I expressed the opinion that the Commission had simply failed to make out a case for a preliminary injunction as to the redemption of the bonds or the payment of the dividend. Being still of that view, I concur with the action of the majority in affirming the District Court's refusal to enjoin the redemption of the bonds.

But, for the reasons expressed in my former dissenting opinion, I dissent from the majority's action in enjoining the payment of the quarterly dividend of forty cents a share. The record shows, I think, that such payment will not impair the utility's capital nor its ability to furnish adequate service. In those circumstances the Commission does not have statutory authority to forbid the payment of a dividend from earned surplus, nor do I think the court is justified in forbidding the payment.

## APPENDIX

On Appellant's Motion for Injunction Pending Appeal
Decided March 29, 1954

## ORDER

PER CURIAM.

This cause came on to be heard on appellant's motion for an injunction pending appeal and was argued by counsel.

It appearing to the Court that immediate termination of the presently existing stay (1) would effectively prevent the Public Utilities Commission from proceeding with the investigation which it authorized on February 26, 1954, by its Order No. 4060, into the adequacy of Capital Transit Company's reserves for depreciation, and related matters stated in the Order, insofar as the results of the investigation might be pertinent to this litigation, and (2) might render this entire appeal moot; it is

ORDERED by the Court that until April 26, 1954* (1) appellee Capital Transit Company, its officers, agents, and attorneys be, and they are hereby, enjoined from paying the quarterly dividend of $384,000 declared February 25, 1954, and (2) appellees Capital Transit Company and Union Trust Company of the District of Columbia, their officers, agents, and attorneys be, and they are hereby, enjoined from taking any action to publish notices of intention of Capital Transit Company to redeem bonds issued under its indenture dated December 1, 1944, and from redeeming the bonds; and it is

FURTHER ORDERED that the Court requests the Commission to file a report with the Court on or before April 19, 1954, of whatever facts the Commission has ascertained, by its investigation under Order No. 4060 or otherwise, which bear upon the question whether Capital Transit Company may legally redeem the said bonds or pay the said dividend; and the Court requests the appellees to reply to such report as early as possible.

Circuit Judge WILBUR K. MILLER dissents from the foregoing order for the reasons indicated in his memorandum this day filed herein.

WILBUR K. MILLER, Circuit Judge (dissenting).

The ultimate question presented by this appeal is whether we should reverse the District Court's denial of the Commission's application for a preliminary injunction. It is settled law that a federal appellate court will not set aside the

---

1. My opinion dissenting from the order appears in the Appendix hereto, beginning at p. 17 [94 U.S.App.D.C. ——, 214 F.2d 251].

* Extended by order of April 22, 1954, to May 7, 1954.

action of a trial court in either granting or denying an application for a preliminary injunction unless its action was clearly erroneous or an abuse of discretion. Cox v. Democratic Central Committee, 1952, 91 U.S.App.D.C. 416, 200 F.2d 356.

Because of this principle I dissent from the order this day entered by my colleagues which grants a preliminary injunction pending further investigation by the Commission. Judge Curran's refusal to issue a preliminary injunction was not, in my opinion, clearly erroneous, nor was it an abuse of discretion. To the contrary, his action was clearly correct. He could have done nothing else under his findings of fact, which were supported by evidence and which are not really challenged on this appeal. The Commission contents itself with saying the trial court had no right to make many of the vital findings upon which decision depended.

The Commission simply failed to make out a case for a preliminary injunction. This failure was not due to lack of opportunity to present whatever grounds the Commission had for injunctive relief. The hearing in the District Court continued for five days. The transcript of the proceeding there fills hundreds of pages. Ample proof was introduced concerning the factual issues. I think this appeal should be decided on the merits now, and the order denying a preliminary injunction should be affirmed because the Commission signally failed to show grounds for the relief it sought.

The order now being entered by this court implicitly decides, it seems to me, that on the record before us the motion for a preliminary injunction was correctly denied. In effect, the order says to the Commission: "You did not make out a case in the five days of hearing before Judge Curran. But we give you an additional period of about thirty days to see if you can discover something more to present in support of your application for a preliminary injunction."

Such action on our part is, I think, beyond our function. Nor do I see how the Commission can hereafter discover anything about the Capital Transit Company which it did not know as it presented its case in the District Court. The life of the utility is the proverbial open book. Its affairs and activities are constantly observed and studied by the regulatory body.

The Commission's argument, which this court has accepted, is that redemption of the bonds and payment of the dividend should be enjoined until it has had on opportunity to complete the investigation, initiated by its Order No. 4060, into:

"(a) The action of the Company in transferring approximately $4,000,000 to the Union Trust Company of the District of Columbia for the call of its outstanding Mortgage Bonds;

"(b) The proposed action of the Company in distributing its non-transit properties described above;

"(c) The past, present and contemplated dividend policies of the Company;

"(d) The financial practices of the Company;

"(e) The adequacy of the provisions made by the Company for future adverse contingencies;

"(f) The adequacy of the Company's reserves for depreciation."

I stop to consider only the last of these six investigative objectives because it seems the most serious, and because a discussion of it may throw some light on the first five objectives which, for lack of time, I cannot treat in detail.

The Order's reference to the inadequacy of reserves for depreciation is based upon this recital earlier therein:

"It appearing to the Commission that:

\* \* \* \* \* \*

"F. The Company's depreciation reserves may be understated in substantial amounts, estimated at about $2,200,000 as of December 31, 1952, which, if determined, may operate as a restriction on earned surplus available for dividends \* \* \*."

Order No. 4060 was entered February 26, 1954, after the dividend had been declared and after funds to redeem the bonds had been deposited with the trustee—and the day before the injunction suit was filed in the District Court. This indicates a rather sudden apprehension on the Commission's part that depreciation reserves, which the Commission itself has constantly supervised, may be inadequate. It amounts to a substantial change in the view concerning depreciation which the Commission expressed as recently as January 20, 1954, when, in its opinion in "In the Matter of Change in Fares of Capital Transit Company," it noted with respect to reserves for depreciation, injuries and damages, and income taxes, that

> " * * * In the past, substantial overaccruals in these accounts have occurred from time to time, with adverse effects on apparent rate of return during these periods. * * * In respect of these items, we find no sufficient basis for adjustment at this time, but we will continue to closely scrutinize these accounts to guard against habitual overaccruals which ultimately prejudice the interests of the transit riders.

> "As noted, the account for reserves for depreciation was on May 29, 1953, changed to a new basis, which in effect lowered the current annual charges. The group rates now in effect reflect the best depreciation practice so far derived from the Commission studies. Studies on this subject will continue, but in this, as in the case of the other reserves, we find for present purposes the reflections contained in Mr. Falk's exhibits not subject to further adjustments."

Let us look at the facts. On February 28, 1954, after the declaration and deduction of the dividend, Capital Transit had earned surplus of $2,499,954.65. On the same day, the bond redemption money having already been deposited with the trustee, the Company had current assets in the sum of $4,139,438.39, including cash and marketable securities of $2,563,133.86. Its property, plant and equipment had been depreciated to $23,756,276.12 from an original cost of $48,647,590.63. Judge Curran found, on evidence, "That the equipment of Capital Transit Company is outstanding, modern and in excellent repair." It is difficult for me to understand the Commission's fear, expressed on February 26, 1954, that Transit's depreciation policy, which it has kept under surveillance for many years, may have produced reserves which were inadequate by about $2,200,000 as long ago as December 31, 1952.

Moreover, Judge Curran found "That as of February 28, 1954, Capital Transit Company owned approximately $27,896,507 of unencumbered and unpledged assets, and had total liabilities of $6,644,561." The stockholders' equity on that date amounted to $21,249,945.65.

A word should be said about the short-term loan of $1,500,000 which Capital Transit obtained from American Security and Trust Company just before the bond redemption money was deposited with the trustee. The Commission argued to us that the loan was illegal because it had not approved the transaction. Whether so or not is immaterial to the issues here. The sum borrowed was not necessary for the payment of the bonds and the dividend. After both had been deducted, the Company had cash of about $2,200,000. So, if it were directed to repay the bank loan, it would still have, after paying the dividend and the bonds, the amount of cash shown by the evidence to be necessary for its daily operations.

Uncontradicted evidence strongly supports Judge Curran's findings that the redemption of the bonds will not impair the Company's ability to furnish adequate service to the public, and that the payment on April 1, 1954, of a forty-cent dividend will not impair the Company's capital or its ability to furnish adequate service in performing its public functions. That being true, there is no threat of irreparable injury to the pub-

lic interest to warrant either the Commission or the court in interfering with the Company's management of its own affairs. Some may think the Commission should have statutory authority, which it now lacks, to forbid the payment of debts and the declaration and payment of dividends from earned surplus, even when the utility's capital will not be impaired thereby and when its ability to furnish service will not be affected. That is a matter for legislative determination with which the courts are not concerned.