**UNITED STATES of America, Plaintiff,**

**v.**

**FMC CORPORATION and American Viscose Corporation, Defendants.**

**Civ. A. No. 41541.**

United States District Court
N. D. California, S. D.
June 27, 1963.

818

Lyle L. Jones, Nicolaus Bruns, Jr., Carl D. Lobell, Richard Boyle, Antitrust Division, Department of Justice, San Francisco, Cal., for plaintiff.

Pillsbury, Madison & Sutro, Francis R. Kirkham, Albert J. Brown, William E. Mussman, San Francisco, Cal., for defendant FMC Corporation.

McCutchen, Doyle, Brown & Enersen, Morris M. Doyle, San Francisco, Cal., Simpson, Thacher & Bartlett, Whitney North Seymour, William J. Manning, New York City, for defendant American Viscose Corporation.

HARRIS, Chief Judge.

Plaintiff United States has instituted these proceedings under Section 7 of the Clayton Act as amended (15 U.S. C.A. § 18) to enjoin defendants, Food Machinery Corporation and American Viscose Corporation (hereafter designated as FMC and Avisco) from carrying out the sale of a substantial part of the assets of defendant Avisco to FMC. The court has jurisdiction to grant the relief sought in accordance with the provisions of Section 15 of the Clayton Act (15 U.S.C.A. § 25).

The proceeding is novel in that it is the first time that the Department of Justice has sought an interlocutory injunction in a so-called "conglomerate" acquisition. Government counsel, however, would seek to label the contemplated acquisition "vertical" or "horizontal" in order to serve the immediate necessities of their argument.

An examination of the factual background is essential and necessary in order to distinguish this case from the principles announced in United States v. Philadelphia National Bank, et al., 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915, and United States v. Ingersoll-Rand Company et al., 3 Cir., 320 F.2d 509, upon which the government places reliance.

The complaint alleges substantially as follows:

That defendant FMC produces and sells products in three major categories: (a) chemicals, (b) machinery and (c) materials for the Armed Services, operating sixty-nine plants in twenty-six states; that FMC net sales for 1961 totalled in excess of $400,000,000 and ranked tenth largest chemical company in the United States. In the same year FMC's sales of machinery and equipment totalled about $148,000,000. One of the principal lines of machinery sold by FMC is its packaging equipment, including machines for making flexible film bags, for filling and sealing film and paper containers, paper box making machinery and wrapping machines for packages to be covered with cellophane or other films. During the past dozen years, FMC has expanded its operations through acquisition of thirty-eight companies and its total sales have increased from approximately $100,000,-000 in 1950 to more than a half billion in 1962.

Avisco operates eight plants and has thirteen sales offices throughout the United States. It is the leading producer of continuous filament rayon yarn and of viscose rayon staple in the country and the second largest producer of acetate rayon. In 1962 Avisco produced over 55% of the viscose staple and 35% of rayon and acetate fibers. In the same year it sold about 25% of all cellophane in the United States. Avisco's net sales for 1962 were approximately $240,000,000 and its assets were almost $300,000,000.

In producing rayon, cellophane and other products Avisco requires certain industrial chemicals in large quantities, including caustic soda and carbon bisulfide.

FMC is a large producer of caustic soda. In 1961 its sales totalled over $11,000,000 or about 6% of the commercial sales. Approximately one-third of Avisco's purchases of caustic soda were made from FMC in 1961, Avisco being the leading caustic soda customer of FMC.

Similarly carbon bisulfide, used in the production of viscose rayon, cellophane and other products finds Avisco the largest single consumer in the United States. In 1961 its purchases constituted about 30% of United States sales. FMC, which produces carbon bisulfide in a plant half owned by Allied Chemical Corporation, has about 20% of national capacity and in 1961 sold about half of Avisco's carbon bisulfide purchases.

During the past year, FMC, as a producer of chemicals, has sold a substantial amount of the four million dollars of glycerin, over five million dollars of sulfuric acid, over eight million dollars of cellulose acetate, about two million dollars of nitro cellulose and about four million dollars of acetic anhydride which were purchased by Avisco.

The total purchases of all raw materials by Avisco in 1962 including wood pulp, exceeded $100,000,000. Avisco obtained almost $23,000,000 of wood pulp from a 50% owned affiliate, the Ketchikan Pulp Company. Most of the balance was purchased from FMC or its suppliers or customers. FMC engages in extensive reciprocal purchasing arrangements with other firms. If the court permits the acquisition of assets, FMC will become the nation's sixty-ninth largest company ranked according to sale. Under the agreement entered into between FMC and Avisco, the latter will sell its properties and assets, except its capital stock holdings in the Monsanto Chemical Company, cash, commercial paper and tax refund credits for $116,000,000.

The government contends that the acquisition of these assets may substantially lessen competition in the manufacture and sale of rayon. This will be accomplished because independent producers of caustic soda will be unable to compete for the market represented by Avisco's purchases. The same is true for producers of carbon bisulfide, industrial chemicals, wood pulp and similar products. In like manner, competition in the sale of packaging machinery used by converters of cellophane may be substantially lessened.

Under all the circumstances the government requests that this court issue a preliminary injunction preventing FMC from acquiring the assets of Avisco at this time.

It may be noted that during the course of the hearings the government made a radical departure from the original theory and confessed that there was no evidence before the court to sustain the proposition that there was a substantial lessening of competition in the manufacture and sale of rayon as the result of the contemplated merger.[1]

The government's affidavits in the main are those of Carl D. Lobell and Richard Boyle, attorneys for the Anti-Trust Division; Carlisle M. Thacker, a licensed chemical engineer; Richard M. Duke, an economist; and Hans Stauffer. Several affidavits have been obtained from small manufacturers of packaging machines. The affidavit of Hans Stauffer, characterized by the defense as a disgruntled competitor, is relied upon quite heavily by the government.

In this connection government counsel states:

"The government here relies upon the disgruntled competitor, Hans Stauffer, but I think the Court is able to weigh some of the statements made and make its own determination as to which of those are factual and which of those represent his own feelings or conclusions or impressions."[2]

The affidavits in the main may be characterized as based upon speculation and conjecture and without immedi-

1. Tr. p. 208.     2. Tr. p. 220.

ate evidentiary support or value in connection with the several contentions advanced by the government. Counsel for the government freely admitted during the course of the hearing that other than the Hans Stauffer affidavit the bulk of the evidentiary background was predicated upon speculation.

"MR. BERNSTEIN: The Government is ready to abandon that for the purposes of this motion, contending that the court doesn't have to reach that question in determining whether or not the Government is entitled to a preliminary injunction in this case.

"The Government's position is that this acquisition is bad for so many reasons that it has already demonstrated, such as it will substantially lessen competition in carbon bisulphide, substantially lessen competition in packaging machines.

"THE COURT: Counsel, may I ask you this question, and I say it quite respectfully: Where in this record, other than speculation, do you have any basis or predicate for the contention you make?

"MR. BERNSTEIN: None.

"THE COURT: That in the several lines that you point out here that there would be a lessening of competition?

"MR. BERNSTEIN: The Government, except for speculation, submits the affidavit of Hans Stauffer, who sets forth the facts concerning the manufacture and sale of carbon bisulphide, expresses his opinion that there would be substantially lessened competition.

"THE COURT: Isn't he a rather disgruntled competitor now that FMC assumes a role? Isn't that about the purport of the affidavit of Hans Stauffer?

"MR. BERNSTEIN: I would concede that he is a competitor and he is disgruntled, or we would expect him to be, and I am sure that the court can take that into consideration. Despite that, the fact remains that if this acquisition were not permitted to be consummated, FMC would find itself in competition with Stauffer. Those are facts in the record beyond speculation that show that. The contemporaneous documents show, in making their forecast, the company was considering increasing its sales in carbon bisulphide. Those sales could only be increased at the expense of Stauffer and the Government thinks that this is a healthy situation.

"THE COURT: Other than the affidavit of Hans Stauffer, where in the record can you point to any other predicate for the contention other than speculation and general application of authorities which may or may not have any bearing upon the controversy at bar?

"MR. BERNSTEIN: Well, as to the latter, Your Honor, the general proposition that when an acquiring company acquires the largest single purchaser of carbon bisulphide, it has the opportunity to foreclose any other competitor from supplying that, and that is not speculation." (Tr. pp. 210, 211, 212.)

The defense position is delineated in the main by the affidavits of Frank H. Reichel, James C. Selover, J. M. Pope and Peter B. Baker.

An appreciation of the historical background leading to the proposed sale of the assets of Avisco is necessary in order to distinguish the case from those cases relied upon by the government wherein competition is the dominant factor.

Since the turn of the present century when man-made fibers were commercially produced and sold in competition with natural fibers Avisco has been a leader in the development and marketing of rayon and acetate. This is set forth in detail in the Reichel affidavit. The picture is one of steady growth until World War II when non-cellulosic man-made fibers

(the chemical fibers such as nylon, orlon, dacron, etc.) were developed. The growth of these fibers came at the expense of rayon acetate whose sole competition had been with the natural fibers (cotton, silk, wool, etc.). Figures disclose that from 1950 to 1960 rayon and acetate declined 22% while chemical fibers increased 400%. According to the Selover affidavit, by 1965 the latter will have outstripped rayon and acetate which will continue to decline. This is true in both the fabric field and the tire field.

New large companies have developed synthetic fibers and have become strong competitors of Avisco. This is true not only in the fiber industry, but also in the film industry. Cellophane has declined in importance while new synthetic films such as polyethylene have grown. The trend will continue according to the Reichel affidavit.

Avisco realized what was happening and formed a joint venture with Monsanto Chemical Company several years ago for the manufacture of chemical film and fibers. However, it sold its interest to Monsanto in return for shares of Monsanto common stock which it now holds. It was the considered opinion of the board of directors of Avisco that its shareholders could realize the value of their investment through a disposition of some $60,000,000 in cash and the Monsanto shares of stock. The assets utilized for production of fibers and film would be sold to a willing buyer. Under these circumstances the directors commenced negotiations for the sale of assets to Stauffer Chemical Company. This transaction was terminated when the government sued to enjoin the transaction. Thereafter it commenced negotiations with FMC which culminated in the contract of January 21, 1963, for the sale of Avisco assets on June 28, 1963, for the sum of $116,000,-000.

FMC, although a diversified corporation, is not a big company in the chemical industry or in other industries in which it is engaged. It has assets of $400,000,-000 and is widely diversified. Its growth has been rapid, both through the acquisition of other companies—some 38 in number—and in internal expansion which represents approximately 85% of such growth. It wishes to enter the chemical fiber field and needs Avisco in order to obtain a marketing organization for its future products.

It should be noted that in connection with the acquisition of the thirty-eight companies the government concedes that although inquiry was made as to each and all of them, no action was taken in opposition to the several acquisitions nor was a charge made that might afford a predicate for an action arising under the Robinson-Patman Act, the Sherman Act or the Clayton Act.

## THE LAW APPLICABLE TO THE GOVERNMENT'S MOTION FOR PRELIMINARY INJUNCTION

The suit strikes at the elementals of traditional American business practices. Although the government denies it, the action in its underlying essentials is aimed at "bigness" *per se*.

The government's theory would have merger jurisprudence "reduced to a simple set of mechanical rules, and virtually no corporate acquisition could pass muster. But as things stand now in the wake of Chief Justice Warren's exegesis on the law of markets and mergers, the government has been squarely rebuffed in its efforts to convert Section 7 into a *per se* statute." [3]

At this posture of the case government counsel asks the court to view with alarm the salient features of the proposed merger, based in the main upon speculation and a purely theoretical and academic viewpoint. When the test of reality is applied it becomes immediately apparent that the motion for the preliminary in-

---

3. Cf. Handler, Annual Review of Antitrust Developments, p. 433, discussion of

Brown Shoe Co. v. United States, 370 U. S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510.

junction must be denied under well-established principles.

The government has simply failed to discharge the burden cast upon it.

The court considers that the acquisition in question is properly characterized as "conglomerate" because FMC and Avisco are not and never have been competitors in the manufacture and sale of any product,—Avisco has sold no products to FMC and manufactures none needed by it. FMC has sold only two products of any value to Avisco. These products are essentially incidental and de minimis in relation to the entire transaction.

The background of the agreement of acquisition entered into between FMC and Avisco is affirmatively set forth in the affidavit of Frank H. Reichel, President and Chairman of the board of directors of Avisco. This agreement would be frustrated and rendered nugatory by the granting of injunctive relief. The avowed intention of Avisco is fully disclosed regarding the ultimate disposition of the operating assets of diminishing value. The question involves Avisco's withdrawal from and FMC's entry into the fiber and film industry.

The evolution and dynamics of the industry are fully portrayed in said affidavit, as well as the significant reasons for withdrawing from the manufacture of rayon and acetate in the textile fiber industry and cellophane in the flexible package material industry.

The government has not cited a single case in which a preliminary injunction has been issued or granted to prevent the consummation of a "conglomerate" merger. Ordinarily, in such a case divestiture is a complete and adequate remedy. The authorities relied upon by the government, particularly United States v. Philadelphia National Bank, et al., supra, and United States v. Ingersoll-Rand Company, supra, are clearly distinguishable on the face of the opinions.

The language in the recent decision of United States v. Continental Can Company, Inc. (S.D.N.Y.), 217 F.Supp. 761, is apposite:

"The Government views with alarm every advantage which Continental or Hazel-Atlas might gain as a result of the merger and sees in each the spectre of anti-competitive effects. But the mere fact that the competitive position of acquiring or acquired companies may be improved by a merger does not establish that the merger is harmful or has any of the proscribed anti-competitive effects.

"The test is not whether, as a result of a merger, either the acquired or acquiring company obtains advantages which help it to compete more effectively. Obviously were this so, any merger permitted under the Act could have no sound business justification. The object of the Clayton Act is not to discourage businesses from taking steps to compete more effectively but to keep competition vigorous and effective. Opportunities to offer improved products, to make cost reductions or to give better service to customers are not in themselves indications of anti-competitive effects. * * * 'It may well be that by effecting a better arrangement for a more profitable undertaking * * competition would be stimulated rather than lessened.' "

The court has full power to award plaintiff appropriate relief in the event it should be eventually determined after trial upon the merits that the sale violates Section 7 of the Clayton Act. United States v. Standard Oil Co. (No.Dist.Cal. 1961, CCH Trade Cases, Par. 70131; United States v. Von's Grocery (So.Dist. Cal.1960, CCH Trade Cases, Par. 69698).

Also, it appears affirmatively from the record before this court that if the motion were granted the defendants might suffer great damage for which they would have no remedy.

Although the motion for preliminary injunction was presented on affidavits, the

hearing partook of all of the essentials of a trial on the merits. This was conceded by government counsel:

"Since the Government seeks this drastic relief, seeking to stop a transaction before it starts, before the trial of the case has been heard completely, and if I may digress for a moment, the Government contends that since there are no serious factual disputes here, the court has pretty much heard the arguments of both sides with respect to this and is pretty much in the same position as it will be in after the trial, the only difference being that many of these statements that are being made that we rely on hearsay in the form of affidavits will be evidence of some other fashion, but when it all boils down, what the Government will seek to have the court find is that there would be a substantial lessening of competition in these lines of commerce in this section of the country and the defendants will say that, well, yes, it would be but we didn't have this anti-competitive purpose, and you really get down to the same issues that we are discussing here today after the trial is over." (Tr. pp. 251, 252)

The transcript before the court, complete as it is, demonstrates that the government has failed to discharge the burden cast upon it and has failed to demonstrate that it has a clear probability of obtaining the final relief demanded.

"Understandably the case of a conglomerate merger set in such a complicated inter-industry pattern as this presented great difficulties of proof for the Government. But that does not mean that the Government's burden was lessened or that it was relieved from the obligation of establishing relevant product markets or of showing reasonable probability of substantial anti-competitive effects in one or more of them as a result of the acquisition. In fact, in the case of a conglomerate merger such as this, where such a wide diversity of factors bear on questions of relevant markets and anti-competitive effects within them, the Government must be at pains to examine in detail all practical indicia which might bear on both questions." United States v. Continental Can Co., Inc., supra, 217 F.Supp. p. 761. See also, Proctor & Gamble Co., Docket No. 6901 (CCH Trade Reg.Rep., 1961–1963).

As interpreted by the Supreme Court, Section 7 of the Clayton Act does not condemn all mergers but only those having demonstrable anti-competitive effects. Brown Shoe Co. v. United States, supra. The statute deals with clear-cut menaces to competition and not with ephemeral possibilities.

The Defendants Will Be Immediately and Irreparably Harmed by the Issuance of an Injunction and the Balance of Equities Lies in Favor of the Defendants Herein

The facts, which are not challenged by the government and are supported by the Reichel affidavit, disclose that Avisco stockholders will lose almost fifty million dollars in the value of their stock, while FMC will lose the benefit to be derived by the acquisition. Time and money have been expended by both corporations over the past year and this will also be lost. Finally, Avisco cannot be restored to its former competitive position and the benefits to be lost by Avisco if the government is granted the relief which it seeks cannot be recouped should defendants ultimately prevail. Under these circumstances it is demonstrable that defendants stand to lose a great deal if a preliminary injunction is granted.

Neither the facts nor the law support the motion of the government for the drastic injunctive relief sought at the threshold of the litigation. Appropriate relief may be accorded plaintiff in the event of a trial.

Accordingly, the motion for the preliminary injunction is hereby denied.