# FEDERAL TRADE COMMISSION *v.* DEAN FOODS CO. ET AL.

No. 970.   Argued March 28, 1966.—Decided June 13, 1966.

*Solicitor General Marshall* argued the cause for petitioner. With him on the brief were *Assistant Attorney General Turner, Richard A. Posner, Howard E. Shapiro* and *James McI. Henderson.*

*Hammond E. Chaffetz* argued the cause for respondents and filed a brief for respondent Dean Foods Co.

*L. Edward Hart, John Paul Stevens* and *Edward I. Rothschild* filed a brief for respondent Bowfund Corp.

Mr. Justice Clark delivered the opinion of the Court.

At issue here is the power of the Court of Appeals under the All Writs Act, 28 U. S. C. § 1651 (a) (1964 ed.), to temporarily enjoin the consummation of a merger that is under attack before the Federal Trade Commission as violative of § 7 of the Clayton Act, as amended, 64 Stat. 1125, 15 U. S. C. § 18 (1964 ed.). This case arose on the application of the Commission for a temporary restraining order and a preliminary injunction against respondents Dean Foods Company and Bowman Dairy Company to maintain the *status quo* until the Commission determined the legality of their merger. The Commission alleged that it had issued a complaint against respondents under § 7 of the Clayton Act and § 5 of the Federal Trade Commission Act, 38 Stat. 719, as amended, 52 Stat. 111, 15 U. S. C. § 45 (1964 ed.), and that from the facts underlying the complaint "it is probable that the Federal Trade Commission will enter an order finding a violation of these laws." The petition stated that there was a "compelling" need for preliminary relief since the "acquisition itself will split Bowman in two—Dean will acquire fixed assets, receivables and good will; Bowman will retain all cash, government and other marketable securities, and some real estate investments" for distribution to its stockholders.[1] In addition, it was alleged that Dean planned to dispose of most of Bowman's retail milk routes, certain of its plants and equipment, and to consolidate the remaining assets. The Commission thus argued that if the merger were allowed to be completed, "Bowman as an entity will no longer exist," and that it "will be 'extremely difficult and very probably impos-

---

[1] Since consummation of the merger all assets of Bowman, with the exception of cash and marketable securities which were exempted from the purchase agreement, have been transferred to Dean. Bowman has ceased dairy operations and now acts as an investment fund, having received and invested the proceeds of the sale.

sible'" to restore Bowman as "a viable independent" company if the merger were subsequently ruled illegal. In other words, consummation of the agreement would "prevent the Commission from devising, or render it extremely difficult for the Commission to devise, any effective remedy after its decision on the merits." As grounds for issuance of an extraordinary writ, the Commission asserted that the Court of Appeals "will, in effect, be deprived of its appellate jurisdiction [over final Commission orders] and of the opportunity to enter a meaningful final order of its own in respect to this acquisition, since the *res in custodia legis*—Bowman—will have vanished."

The Court of Appeals entered a temporary restraining order against respondents, as prayed. On the hearing for a preliminary injunction, however, it dissolved the temporary restraining order and dismissed the petition for the reasons that "no cease and desist order has been entered by the Commission relative to the subject matter in the case at bar and . . . we now hold that the Commission did not have authority to institute this proceeding in this court . . . ." In its final judgment the Court of Appeals supported its refusal to grant relief at the request of the Commission by reference to the fact that:

> "in the 84th Congress and in the 89th Congress bills sponsored by the said Commission were introduced, which bills if enacted into law would have conferred upon the Commission such authority as it is attempting to exercise in the case now before this court, but that said measures were not enacted into law and Congress has not provided otherwise for bestowing this authority upon said Commission." 356 F. 2d 481, 482.

A few hours after the Court of Appeals entered its order on January 19, 1966, the contract was closed and Dean acquired legal title to Bowman's operating assets.

Upon application by the Solicitor General on behalf of the Commission, MR. JUSTICE CLARK, after consulting the other members of this Court, entered a preliminary injunction on January 24, 1966, restraining respondents from making any material changes with respect to Bowman's corporate structure or the assets purchased. This order provided that Dean might sell Bowman's retail home delivery routes upon terms and conditions acceptable to the Commission, but that any milk supplied by Dean to the purchasers of the routes must continue to be delivered under the Bowman label and from former Bowman plants. We granted certiorari on February 18, 1966, 383 U. S. 901, and expedited consideration of this case. We conclude that the Court of Appeals erred and reverse its judgment.

## I.

Since the case comes to us from a dismissal on jurisdictional grounds we must take the allegations of the Commission's application for a preliminary injunction as true. We need not detail the facts further than to say that Dean and Bowman were substantial competitors in the sale of packaged milk in the Chicago area, one of the largest markets in the United States for packaged milk. On November 2, 1965, attorneys for Dean and Bowman met with representatives of the Commission to discuss a proposal by Dean to purchase all of Bowman's plants and equipment, the Bowman name, all customer and supplier lists together with the benefit of their relationships, and various other assets, all of which were situated in the Chicago area. Bowman would consequently cease doing a dairy business there. It was emphasized that the inquiry was merely to ascertain the views of the staff of the Commission and not to secure a formal advisory opinion. After investigation, on December 3, 1965, the Commission's staff advised Dean's counsel that it believed the acquisition would raise serious questions under the

antitrust laws, and that on the basis of existing information the staff would recommend that the Commission issue a complaint against the acquisition if consummated. After further meetings, Dean's counsel informed the Commission's staff on December 14, 1965, that the agreement had been signed. A week later the Commission issued a formal complaint charging that the agreement violated § 7 of the Clayton Act and § 5 of the Federal Trade Commission Act.

It appears that at the time of the merger Dean was the third or fourth largest distributor of packaged milk in the Chicago area; Bowman was at least the second largest in that market; and together they enjoyed approximately 23% of the sales of packaged milk in the same area, while the four largest dairy companies had a 43% share thereof. Affidavits attached to the Commission's application alleged that between 1954 and 1965 the number of packaged milk sellers in the Chicago market had declined from 107 to 57, and that in the four months prior to the filing of the complaint four more firms had been eliminated by acquisitions. From these statistics it was concluded that the effect of Dean's acquisition of Bowman would be to substantially lessen competition. We place in the margin the Commission's summation of its complaint.[2]

---

[2] The Federal Trade Commission alleged:

"(a) Actual or potential competition in the sale and distribution of packaged milk in the Chicago Area will be eliminated or prevented;

"(b) Dean, a major competitive factor in the sale and distribution of packaged milk in the Chicago Area, will eliminate Bowman, another major competitive factor in the sale and distribution of packaged milk in the Chicago Area;

"(c) Concentration in the sale and distribution of packaged milk in the Chicago Area will be increased and deconcentration will be prevented;

"(d) The restraining influence on non-competitive behavior in the sale and distribution of packaged milk in the Chicago Area, which

## II.

The All Writs Act, 28 U. S. C. § 1651 (a), empowers the federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." The exercise of this power "is in the nature of appellate jurisdiction" where directed to an inferior court, *Ex parte Crane*, 5 Pet. 190, 193 (1832) (Marshall, C. J.), and extends to the potential jurisdiction of the appellate court where an appeal is not then pending but may be later perfected. Cf. *Ex parte Bradstreet*, 7 Pet. 634 (1833) (Marshall, C. J.). These holdings by Chief Justice Marshall are elaborated in a long line of cases, including *McClellan* v. *Carland*, 217 U. S. 268 (1910), where Mr. Justice Day held: " [w]e think it the true rule that where a case is within the appellate jurisdiction of the higher court a writ . . . may issue in aid of the appellate jurisdiction which might otherwise be defeated . . . ." At 280. And in *Roche* v. *Evaporated Milk Assn.*, 319 U. S. 21 (1943), Chief Justice Stone stated that the authority of the appellate court "is not confined to the issuance of writs in aid of a jurisdiction already acquired by appeal but extends to those cases which are within its appellate jurisdiction although no appeal has been per-

---

existed by reason of the independent operation of Bowman, will be eliminated;

"(e) The acquisition will contribute to the over-all trend toward concentration in the sale and distribution of packaged milk in the United States . . . thereby tending to bring about the adverse competitive effects described [elsewhere in the complaint];

"(f) The emergence or growth of smaller packaged milk companies in the Chicago Area will be retarded, discouraged or prevented;

"(g) The members of the consuming public, in the Chicago Area and throughout the United States, will be denied the benefits of free and open competition in the sale and distribution of packaged milk."

fected." At 25. Likewise, decisions of this Court "have recognized a limited judicial power to preserve the court's jurisdiction or maintain the *status quo* by injunction pending review of an agency's action through the prescribed statutory channels. . . . Such power has been deemed merely incidental to the courts' jurisdiction to review final agency action . . . ." *Arrow Transp. Co.* v. *Southern R. Co.*, 372 U. S. 658, 671, n. 22 (1963). There the Court cited such authority as *Scripps-Howard Radio, Inc.* v. *Federal Communications Comm'n*, 316 U. S. 4 (1942); *West India Fruit & S. S. Co.* v. *Seatrain Lines, Inc.*, 170 F. 2d 775 (C. A. 2d Cir. 1948); and *Board of Governors* v. *Transamerica Corp.*, 184 F. 2d 311 (C. A. 9th Cir.), cert. denied, 340 U. S. 883 (1950).

Section 11 (c) of the Clayton Act, as amended, 73 Stat. 243, 15 U. S. C. § 21 (c), gives exclusive jurisdiction to review final orders by the Commission against illegal mergers, on application of "[a]ny person required by such order . . . to cease and desist from any such violation," to the courts of appeals "for any circuit within which such violation occurred or within which such person resides or carries on business." This grant includes the traditional power to issue injunctions to preserve the *status quo* while administrative proceedings are in progress and prevent impairment of the effective exercise of appellate jurisdiction. Cf. *Continental Ill. Nat. Bank* v. *Chicago, R. I. & P. R. Co.*, 294 U. S. 648, 675 (1935). A recent case involving a similar statutory proceeding is dispositive of this issue. *Whitney Nat. Bank* v. *New Orleans Bank*, 379 U. S. 411 (1965), raised the question whether holding companies were "lawfully entitled" to operate subsidiary banks within Louisiana, a question we held should be determined in the first instance by the Federal Reserve Board. We further concluded that the Board should reconsider its initial approval of such a plan in light of

an intervening Louisiana statute, and so gave the parties, who had sought review of the Board's order before the Court of Appeals for the Fifth Circuit, an opportunity to move that the case be remanded to the Board. It was noted that the Court of Appeals had authority "to issue such orders as will protect its jurisdiction pending final determination of the matter," at 415, and that § 1651 (a) empowered it to stay "the order of approval of the Federal Reserve Board pending final disposition of the review proceeding." At 425. In response to the argument that the stay would not be sufficient because the Comptroller of Currency nonetheless intended to issue a certificate to the bank, we stated that if "the Court of Appeals should find it necessary to take direct action to maintain the status quo and prevent the opening of the bank, it has ample power to do so" by an injunction against the applicants before the Federal Reserve Board themselves. At 426. Such action would be analogous to the relief requested here by the Commission.[3]

These decisions furnish ample precedent to support jurisdiction of the Court of Appeals to issue a preliminary injunction preventing the consummation of this agreement upon a showing that an effective remedial order, once the merger was implemented, would otherwise be virtually impossible, thus rendering the enforcement of any final decree of divestiture futile.

### III.

Dean and Bowman insist, however, that as a creature of statute the Commission may exercise only those functions delegated to it by Congress, and that Congress has

---

[3] Of course, the courts of appeals have traditionally framed § 1651 (a) writs in the form of compulsory injunctions aimed at private parties. *E. g., Application of President & Directors of Georgetown College,* 118 U. S. App. D. C. 80, 331 F. 2d 1000, cert. denied, 377 U. S. 978 (1964). See Recent Cases, 77 Harv. L. Rev. 1539, 1542 (1964).

failed to give the Commission express statutory authority
to request preliminary relief under the All Writs Act.[4]
But the Commission is a governmental agency to which
Congress has entrusted, *inter alia,* the enforcement of the
Clayton Act, granting it the power to order divestiture in
appropriate cases. At the same time, Congress has given
the courts of appeals jurisdiction to review final Com-
mission action. It would stultify congressional purpose
to say that the Commission did not have the incidental
power to ask the courts of appeals to exercise their author-
ity derived from the All Writs Act.[5] Indeed, the opin-

---

[4] For the proposition that the Commission must have express
statutory authority to seek injunctions in the courts of appeals
two cases are cited. The first, *Humphrey's Executor* v. *United
States,* 295 U. S. 602 (1935), has no relevance to our problem. And
the other, *Federal Trade Comm'n* v. *Eastman Kodak Co.,* 274 U. S.
619, 623–625 (1927), even though apposite, has been repudiated. It
held that in fashioning a final decree the Commission "exercises only
the administrative functions delegated to it by the Act," and, there-
fore, could not order divestiture of laboratories acquired through
a stock purchase. This view was rejected in *Pan American World
Airways, Inc.* v. *United States,* 371 U. S. 296, 312–313, nn. 17–18
(1963), the Court holding that "the power to order divestiture need
not be explicitly included in the powers of an administrative agency
to be part of its arsenal of authority," citing *Gilbertville Trucking
Co.* v. *United States,* 371 U. S. 115 (1962).

[5] Such a holding would especially interfere with the functions
Congress has given the Commission in the merger field. As THE
CHIEF JUSTICE stated in *Brown Shoe Co.* v. *United States,* 370
U. S. 294 (1962), the Congress "sought to assure the Federal Trade
Commission and the courts the power to brake this force [business
concentration] at its outset and before it gathered momentum."
At 317–318. But without standing to secure injunctive relief, and
thereby safeguard its ability to order an effective divestiture of
acquired properties, the Commission's efforts would be frustrated.
As MR. JUSTICE DOUGLAS said in *United States* v. *Crescent Amuse-
ment Co.,* 323 U. S. 173, 186 (1944):

"The acquisition of a competing theatre terminates at once its
competition. . . . And where businesses have been merged or

ions in *Arrow Transp. Co.* and *Whitney Nat. Bank* necessarily recognized the standing of administrative agencies to seek such preliminary relief to ensure effective judicial review. Both decisions referred to *Board of Governors* v. *Transamerica Corp., supra,* where the Court . of Appeals stayed a merger on application by the Federal Reserve Board. See also *Public Utilities Comm'n* v. *Capital Transit Co.,* 94 U. S. App. D. C. 140, 214 F. 2d 242 (1954), and *West India Fruit & S. S. Co.* v. *Seatrain Lines, Inc.,* 170 F. 2d 775, 779 (C. A. 2d Cir. 1948). There is no explicit statutory authority for the Commission to appear in judicial review proceedings, but no one has contended it cannot appear in the courts of appeals to defend its orders. Nor has it ever been asserted that the Commission could not bring contempt actions in the appropriate court of appeals when the court's enforcement orders were violated, though it has no statutory authority in this respect. Such ancillary powers have always been treated as essential to the effective discharge of the Commission's responsibilities.

---

purchased and closed out it is commonly impossible to turn back the · clock."

Here the plan of merger itself contemplates the sale of the acquired home delivery milk routes and certain milk plants. In addition, Bowman has retained its cash and securities, with the intention ultimately to distribute them to its stockholders. If consummation of the merger is not restrained, the restoration of Bowman as an effective and viable competitor will obviously be impossible by the time a final order is entered. This is not unusual. Administrative experience shows that the Commission's inability to unscramble merged assets frequently prevents entry of an effective order of divestiture. *E. g., Ekco Products Co.,* Trade Reg. Rep. ¶16,879 (1964) (1963–1965 Transfer Binder), aff'd, 347 F. 2d 745 (C. A. 7th Cir. 1965); *Foremost Dairies, Inc.,* 60 F. T. C. 944, order modified per stipulation (C. A. 5th Cir. 1965) (Docket No. 18,815).

It must be remembered that the courts of appeals derive their power to grant preliminary relief here not from the Clayton Act, but from the All Writs Act and its predecessors dating back to the first Judiciary Act of 1789. Congress has never restricted the power which the courts of appeals may exercise under that Act. Nor has it withdrawn from the Commission its inherent standing as a suitor to seek preliminary relief in courts of appropriate jurisdiction.[6] In the absence of explicit direction from Congress we have no basis to say that an agency charged with protecting the public interest cannot request that a court of appeals, having jurisdiction to review administrative orders, exercise its express authority under the All Writs Act to issue such temporary injunctions as may be necessary to protect its own jurisdiction.

Respondents point—as did the Court of Appeals— to the fact that the Commission sought authority from the Eighty-fourth through the Eighty-ninth Congresses to grant preliminary injunctions itself or to proceed in the district court as the Department of Justice can under the Clayton Act.[7] Both former Chairman Gwynne and Chairman Dixon appeared in support of the measures,[8] and referred to *Federal Trade Comm'n* v. *International*

---

[6] Cf. *Public Utilities Comm'n* v. *Capital Transit Co.*, 94 U. S. App. D. C. 140, 214 F. 2d 242, 245 (1954), where the Court of Appeals for the District of Columbia Circuit gave as one of its reasons for granting an injunction the fact that "the moving party in the litigation was the Public Utilities Commission of the District of Columbia, a governmental agency clothed by Congress with special responsibility in the matters involved."

[7] *E. g.*, H. R. 9424 and S. 3341 and 3424, 84th Cong., 2d Sess. (1956); H. R. 49 and 1574, 89th Cong., 1st Sess. (1965).

[8] Hearings before the Antitrust Subcommittee of the House Committee on the Judiciary, 84th Cong., 2d Sess., ser. No. 15, p. 35 (1956); Hearings before the Subcommittee on Antitrust and Monopoly of the Senate Committee on the Judiciary on S. 198, S. 721, S. 722 and S. 3479, 85th Cong., 2d Sess., 42–45 (1958) (testimony of Chairman Gwynne). Hearings before the Antitrust Subcommit-

*Paper Co.*, 241 F. 2d 372 (C. A. 2d Cir. 1956), which held the Commission had no standing to seek preliminary injunctions from the courts of appeals.[9] In addition, several Congressmen made statements regarding the need for statutory amendment.[10] However, no proposal was put before the Congress relating to the authority of the Commission to secure preliminary relief before the courts of appeals in accordance with § 1651 (a). The proposals concerned only the power of the Commission itself to issue preliminary relief or to proceed in the district courts for that purpose.

Congress neither enacted nor rejected these proposals; it simply did not act on them.[11] Even if it had, the legislation as proposed would have had no effect whatever on the power that Congress granted the courts by the All Writs Act. We cannot infer from the fact that Congress took no action at all on the request of the Com-

---

tee of the House Committee on the Judiciary, 87th Cong., 1st Sess., ser. No. 5, pp. 85–86 (1961) (testimony of Chairman Dixon).

[9] They also directed attention to the denial of injunctive relief in *Federal Trade Comm'n* v. *Farm Journal, Inc.* (C. A. 3d Cir. 1955) (unreported). Both men failed to mention the contrary decision in *Board of Governors* v. *Transamerica Corp.*, 184 F. 2d 311 (C. A. 9th Cir.), cert. denied, 340 U. S. 883 (1950). In *Ekco Products Co.*, Trade Reg. Rep. ¶16,879 (1964) (1963–1965 Transfer Binder), aff'd, 347 F. 2d 745 (C. A. 7th Cir. 1965), Commissioner Elman stated that the question of the Commission's ability to obtain a preliminary injunction under the All Writs Act "has not been authoritatively answered." At 21,905, n. 10.

[10] Hearings before the Subcommittee on Antitrust and Monopoly of the Senate Committee on the Judiciary on S. 198, S. 721, S. 722 and S. 3479, 85th Cong., 2d Sess., 156–157 (1958) (testimony of Congressman Celler). Hearings before the Antitrust Subcommittee of the House Committee on the Judiciary, 87th Cong., 1st Sess., ser. No. 5, pp. 42–45 (1961) (statement of Congressman Patman).

[11] Cf. *Helvering* v. *Hallock*, 309 U. S. 106, 120 (1940), where it was said that to give weight to the nonaction of Congress was to "venture into speculative unrealities."

mission to grant it or a district court power to enjoin a merger that Congress thereby expressed an intent to circumscribe traditional judicial remedies. Cf. *Scripps-Howard Radio, Inc.* v. *Federal Communications Comm'n,* 316 U. S. 4, 11 (1942). The decision in *Wong Yang Sung* v. *McGrath,* 339 U. S. 33 (1950), is apposite. Following an adverse decision in *Eisler* v. *Clark,* 77 F. Supp. 610 (D. D. C. 1948), the Department of Justice asked Congress for legislation exempting the Immigration Service from the Administrative Procedure Act. 60 Stat. 237, 5 U. S. C. § 1001 (1964 ed.). As was the case here, the appropriate committees of both Houses reported the proposal favorably but Congress adjourned without taking any action. The Department nonetheless insisted in *Wong Yang Sung* that hearings in deportation cases did not have to conform to the requirements of the Administrative Procedure Act. In his discussion of legislative history, Mr. Justice Jackson wrote for a unanimous Court that "we will not draw the inference, urged by petitioner, that an agency admits that it is acting upon a wrong construction by seeking ratification from Congress. Public policy requires that agencies feel free to ask legislation which will terminate or avoid adverse contentions and litigations." At p. 47. This Court has consistently refused to construe such requests by government agencies and the resulting nonaction of the Congress as affirmative evidence of no authority.[12] Thus, in *United States* v. *du Pont & Co.,* 353 U. S. 586 (1957), MR. JUSTICE BRENNAN held:

> "During the 35 years before this action was brought [in 1949], the Government did not invoke § 7 against vertical acquisitions. The Federal Trade Commission has said that the section did not apply to vertical acquisitions. See F. T. C., Report on

---

[12] Cf. *United States* v. *Philadelphia Nat. Bank,* 374 U. S. 321, 348–349 (1963).

Corporate Mergers and Acquisitions, 168 (1955), H. R. Doc. No. 169, 84th Cong., 1st Sess. Also, the House Committee considering the 1950 revision of § 7 stated that '. . . it has been thought by some that this legislation [the 1914 Act] applies only to the so-called horizontal mergers. . . .' H. R. Rep. No. 1191, 81st Cong., 1st Sess. 11. The House Report adds, however, that the 1950 amendment was purposed '. . . to *make it clear* that the bill applies to all types of mergers and acquisitions, vertical and conglomerate as well as horizontal . . . .' (Emphasis added.)

"This Court has the duty to reconcile administrative interpretations with the broad antitrust policies laid down by Congress. . . . The failure of the Commission to act is not a binding administrative interpretation that Congress did not intend vertical acquisitions to come within the purview of the [1914] Act." At p. 590.

Despite the representations of the Commission that the 1914 Act did not apply to vertical mergers, its sponsorship of legislation to so enlarge its coverage, and the passage of the 1950 Act by the Congress for this purpose, this Court nonetheless held that the 1914 Act included vertical mergers from its very inception, and thus required du Pont to divest its interest in General Motors stock, which had been acquired in 1915.

It is therefore clear that the "proceedings" in the Congress with reference to the authority of the Commission itself to issue or apply to the district courts for the issuance of preliminary injunctions in merger cases have no relevance whatever to the question before us. In short, Congress gave no attention to the exercise of judicial power by the courts of appeals under the All Writs Act, leaving that power intact and the standing of the Commission to invoke it ·undiminished. We thus hold

that the Commission has standing to seek preliminary relief from the Court of Appeals under the circumstances alleged. As stated earlier, we must take the allegations of the Commission as true, and so do not pass upon whether a preliminary injunction should be issued. That is for the Court of Appeals to decide on remand, as it would decide any application to it for relief under the All Writs Act. *Reversed and remanded.*

MR. JUSTICE FORTAS, with whom MR. JUSTICE HARLAN, MR. JUSTICE STEWART and MR. JUSTICE WHITE join, dissenting.

The Court today decides that the courts of appeals must entertain original applications by the Federal Trade Commission for the issuance of preliminary injunctions to restrain mergers alleged to violate § 7 of the Clayton Act, 15 U. S. C. § 18 (1964 ed.), pending proceedings before the Commission to determine whether such mergers violate that section.

In so deciding, the Court determines that the Commission—an administrative agency with defined and circumscribed powers—is authorized to seek such relief in the courts of appeals; and that the courts of appeals, under the All Writs Act, 28 U. S. C. § 1651 (a) (1964 ed.), have power to entertain the Commission's petition and to grant the injunctive relief.

This decision cannot be supported. Not a single one of the prior decisions of this Court cited as authority sustains it, either specifically or indirectly, or by principle or analogy. No statute of the Congress can be appropriately summoned to the Court's aid. The plain, unmistakable intent of the Congress in defining the Commission's powers and the jurisdiction of the courts of appeals is that no such threshold injunctive power is available at the Commission's behest. The Act plainly and explicitly vests the governmental power to restrain and enjoin violations of the Act in the district courts,

not in the court of appeals; and it plainly and explicitly empowers the United States attorneys "under the direction of the Attorney General"—and not the Federal Trade Commission—to institute such proceedings. 15 U. S. C. § 25 (1964 ed.).

Since 1956, the Federal Trade Commission has persistently requested the Congress to enact legislation giving the Commission itself the power to enjoin, or alternatively, to seek a district court order to enjoin mergers pending the outcome of the Commission's proceedings. Congress has just as persistently refused to do so.

Beginning in 1956, at least 37 bills have been introduced in the Congress, directed to providing the Commission with a threshold, temporary remedy. None has been enacted, despite the unequivocal statements of the three chairmen of the Commission who served during those years that the agency presently has no power to seek relief ancillary to its administrative proceedings. This Court now bestows what the Congress has withheld.

The statements in the Court's opinion indicating that its result is necessary unless we are to "stultify congressional purpose" fly in the teeth of the record, plainly written and repeatedly reiterated. Congress is keenly interested in enforcement of § 7. But it has demonstrated over and over again that it has no interest in arming the Commission with the power today conferred upon it. It created and equipped the Commission with administrative and quasi-judicial powers to serve a function quite distinct from that of a prosecutor or litigant. It has repeatedly declined the urgent request to revise the Commission's role and function. Indeed, Congress has refused to empower the Commission to ask for this relief in an otherwise suitable forum—the district courts. But the Court today gives this agency, which Congress obviously regards as unsuitable for the purpose, power to resort to an unsuitable forum—the courts of appeals—for the same purpose.

The Commission, the Executive Branch of the Government, the Congress and all courts which have passed upon the point have until today proceeded on the expressed premise that the Federal Trade Commission has no authority to seek such relief.[1]  I have not found a single commentator in this much-discussed field of law who has suggested that the Commission has such authority, and none is cited in the Court's opinion or in the briefs of the parties.[2]

---

[1] See *Federal Trade Comm'n* v. *International Paper Co.*, 241 F. 2d 372 (C. A. 2d Cir. 1956); *Federal Trade Comm'n* v. *Farm Journal, Inc.* (C. A. 3d Cir. 1955). In *In the Matter of A. G. Spalding & Bros., Inc.* (F. T. C. Docket No. 6478), the Commission failed to obtain preliminary relief in the First Circuit, but did get respondent's commitment not to alter the *status quo* save on 30 days' notice. See *A. G. Spalding & Bros., Inc.* v. *F. T. C.*, 301 F. 2d 585 (C. A. 3d Cir. 1962).

The sole instance where injunctive relief was obtained is *Board of Governors* v. *Transamerica Corp.*, 184 F. 2d 311 (C. A. 9th Cir. 1950), cert. denied, 340 U. S. 883. In *Transamerica* the threatened action would have defeated the Board's jurisdiction entirely.  The Board (whose role in § 7 enforcement is like the FTC's) argued both in the Court of Appeals and in opposition to the petition for certiorari, that if Transamerica were not restrained from disposing of stock holdings the legality of whose acquisition was in issue in the administrative proceedings, the effect under the pre-1950 version of § 7, as construed by this Court in *Arrow-Hart & Hegeman Electric Co.* v. *F. T. C.*, 291 U. S. 587, would be to "oust the Board of its jurisdiction under Section 11 of the Clayton Act . . . [and to] defeat the exclusive jurisdiction of the Court of Appeals to enforce or affirm such order as the Board might make . . . ." Government's Brief in Opposition in *Transamerica Corp.* v. *Board of Governors* (Nos. 322 and 323, October Term, 1950), at pp. 5, 8–9, 15.  See also *United States* v. *Philadelphia Nat. Bank*, 374 U. S. 321, 339, n. 17, where *Transamerica* appears to have been distinguished from *International Paper; supra*, precisely on the ground that the writ there was necessary to protect the "jurisdiction" both of the agency and of the Court of Appeals—a conventional use of the All Writs Act.

[2] On the contrary, the common view is that such authority is entirely lacking. See, *e. g.*, Kaysen & Turner, Antitrust Policy

I can only assume that the majority is motivated by a desire to lend all assistance to the Federal Trade Commission in its administration of § 7. However commendable this motivation may be in general, it is here entirely misdirected. Indulgence in this generous spirit unjustifiably burdens the courts of appeals with a fact-finding duty which they are unable to perform; disrupts the statutory division of functions between the Commission and the Department of Justice; and deprives parties of the opportunity for fair and careful consideration of their proposals which is promised by our law, by the decisions of this Court and the economic needs of the Nation.

The Clayton Act contains specific and comprehensive enforcement provisions. There is no vacuum to be filled by ingenuity. There is no room for improvisation. The Act is fully armed with a triple arsenal. Enforcement powers with respect to mergers under § 7 are vested in the Department of Justice, the Federal Trade Commission and private persons who claim injury as a result of the merger. Both the Department of Justice and private litigants are authorized to seek injunctive relief in the district courts. But the role and function of the Federal Trade Commission is differently conceived.

The powers of the Commission and the manner of their exercise and of review and enforcement of Commission orders are set out in meticulous detail. Whenever the Commission "shall have reason to believe that any person is violating or has violated" § 7, it shall issue a complaint. The complaint is to be served upon "such person and the Attorney General." The Attorney General may intervene in the Commission's proceeding. He may institute actions in the district court for injunctive relief.

258 (1959); Duke, Scope of Relief Under Section 7 of the Clayton Act, 63 Col. L. Rev. 1192, 1206, n. 85 (1963); Note, 79 Harv. L. Rev. 391, 404 (1965); Note, 40 N. Y. U. L. Rev. 771 (1965); Comment, 32 N. Y. U. L. Rev. 1297 (1957).

The Commission is to hold a hearing; testimony is to be taken; the Commission is to "make a report in writing"; and it is empowered to issue an order to cease and desist and to compel the respondent *to "divest itself of the stock . . . or assets . . . held . . . contrary to the provisions of* [§ 7]." 15 U. S. C. § 21 (b) (1964 ed.). (Emphasis supplied.) The respondent may obtain review of the order in an appropriate court of appeals in the manner and with the consequences meticulously defined in the Act, as hereinafter discussed.

There is no question—I submit that there can be no question—that Congress from the outset intended that the Federal Trade Commission should not have other or different or supplementary or additional power to enforce § 7.[3] The Commission was created in the same

---

[3] The Court's opinion asserts, in alleged demonstration of the "ancillary powers" which have been inferred on the Commission's behalf, that it may bring "contempt actions in the appropriate court of appeals when the court's enforcement orders were violated, though it has no statutory authority in this respect." The Court errs. The Commission's powers in this respect are not "implied." The machinery by which the Commission procures compliance with its orders is, and always has been, spelled out by statute. Until 1959, one could with impunity violate an FTC Clayton Act order. Such an order was not final until the respondent sought judicial review and a Court of Appeals granted enforcement. Disobedience thereafter was a contempt of court. In the event the respondent did not seek review, the Commission was required to ascertain that he was violating its order and then proceed, *pursuant to express statutory provision* (15 U. S. C. § 21), to seek enforcement in the courts of appeals. See 28 U. S. C. § 2112 (1964 ed.), authorizing the courts of appeals to promulgate rules for enforcement proceedings; and see, *e. g.,* 1st Cir. R. 16. Cf. Fed. Rule Civ. Proc. 70. A violation thereafter constituted contempt of court. The courts declined to infer any more convenient substitute for this three-step process. See *Federal Trade Comm'n* v. *Henry Broch & Co.,* 368 U. S. 360, 365; *Federal Trade Comm'n* v. *Ruberoid Co.,* 343 U. S. 470, 477–479.

The statute was amended in 1959. An FTC order under the Clayton Act is now final upon expiration of the time allowed re-

year that the Clayton Act was adopted. It was supposed to be an expert, administrative agency. It was not intended to be a litigation arm of the United States except as its own final orders might be involved.[4] It was not intended to have power to seek or deliver the quick result, even in emergencies. This power, so far as the Government is concerned, was explicitly, carefully confined to the district courts on application of the United States attorney "under the direction of the Attorney General."

Section 15 of the Clayton Act, 15 U. S. C. § 25, expressly authorizes the Department of Justice to proceed in the district courts of the United States to obtain preliminary relief against allegedly unlawful mergers. Section 16 makes the same remedy available on application of private litigants. 15 U. S. C. § 26 (1964 ed.). Nowhere is such power given to the Commission. It would be incredible to suggest that this omission was an oversight—or even an error. It was by design—and; I suggest, by rational design.

The Commission was not intended to—it has no power to—it should not—make a judgment on the merits prior to notice and hearing. To sanction its doing so is to strike a devastating blow at the fundamental theory upon which the exercise of both prosecutorial and adjudicatory functions by an administrative agency is based. Cf.

_____

spondent to seek judicial review. If he does not appeal the order and violates its terms after it becomes final, the Government may proceed, *pursuant to statute* (15 U. S. C. §§ 21 (g) and (*l*)), to seek civil penalties of up to $5,000 per violation.

In short, and contrary to the suggestion in the Court's opinion, the Commission's power to enforce compliance with its orders is and has been wholly statutory. Nothing has been left to implication.

[4] See 51 Cong. Rec. 1963, 13047, 8977 (1914); Rublee, The Original Plan and Early History of the Federal Trade Commission, 11 Acad. Pol. Sci. Proc. 666 (1925).

§ 5 (c) of the Administrative Procedure Act of 1946, 5 U. S. C. § 1004 (c) (1964 ed.).

The Commission, prior to taking evidence and writing a report, is supposed to make only a very limited judgment: that there is "reason to believe" the law is being violated. But to obtain a preliminary injunction, it must—without hearing the other side, and ordinarily merely on its staff's recommendation, necessarily based upon a quick exposure of the facts—file affidavits or produce evidence with the calculated purpose of demonstrating to the court of appeals that consummation of the merger will have such adverse effects that it must be halted *in limine*. In fact, and in all realism, it must take positions and establish, with sufficient positiveness to overcome strenuous opposition, that the merger will tend substantially to lessen competition or create danger of monopoly, that it is harmful to the economy, immediately threatening in its consequences, and that it is unlawful. There must be Commission conclusions, not merely the views of the staff. Their assertion and necessarily stout advocacy make a mockery of a subsequent quasi-judicial proceeding in which the Commission is supposed objectively to consider the same issues on the basis solely of the record.

The clear design of the statute is that the authority to decide, on behalf of the Government, to seek the powerful remedy of preliminary injunction, and the power to do so, are vested in the Attorney General. That is his business—his type of function. It is deliberately withheld from the Commission. That is not its business. The Commission is supposed to be an expert agency, acting deliberately, bringing to bear upon the complex economic problems of a merger, that judgment and experience which can emerge only from careful factual inquiry, the taking of evidence and the formulation of a report. The Federal Trade Commission was not in-

tended to be a gun,[5] a carbon copy of the Department of Justice.[6]

It has steadily been acknowledged by spokesmen for the Commission, by leading members of the Congress, and by officials of the Executive Branch that the FTC has no basis in statute to seek the relief the Court today makes available to it. In the Appendix to this opinion, I refer to these acknowledgments and I describe the unsuccessful, oft-repeated efforts of the Commission to obtain legislation to give it the power it has now successfully obtained from this Court.[7]

---

[5] Where Congress has determined that it is appropriate for the Commission to seek threshold relief in order to protect the public, it has expressly so provided—directing that the Commission proceed in an appropriate tribunal, the United States District Courts. See § 13 (a) of the Federal Trade Commission Act (Wheeler-Lea amendments), 15 U. S. C. § 53 (a) (1964 ed.); § 302 of the Food, Drug, and Cosmetic Act, 21 U. S. C. § 332 (1964 ed.); § 7 (b) of the Wool Products Labeling Act, 15 U. S. C. § 68e (b) (1964 ed.); § 9 (b) of the Fur Products Labeling Act, 15 U. S. C. § 69g (b), (1964 ed.); § 6 (a) of the Flammable Fabrics Act, 15 U. S. C. § 1195 (a) (1964 ed.); and § 8 of the Textile Fiber Products Identification Act, 15 U. S. C. § 70f (1964 ed.).

[6] See Elman, Rulemaking Procedures in the FTC's Enforcement of the Merger Law, 78 Harv. L. Rev. 385, 387–388 (1964).

[7] The Court declares that these materials are irrelevant because Congress had before it proposals to authorize the Commission itself to issue restraining orders *pendente lite* or to apply to the district courts for such relief. But the fact that no one proposed and Congress did not consider providing that the Commission might have recourse to the courts of appeals merely emphasizes the extreme and extraordinary nature of the device which the Court today creates. The plain fact, and the short answer, is that Congress refused to authorize preliminary restraints at the command of the Commission. Its refusal to authorize such relief in the district courts demonstrates, *a fortiori*, that it would not create such a remedy in the courts of appeals.

The Court also suggests that it would be improper to draw conclusions from congressional inaction. The inference that I draw from congressional refusal to make preliminary injunctive relief

In short, the Commission has no power to decide that a proposed merger should be enjoined *pendente lite;* it has no authority to seek such relief, temporary or permanent, in any court—trial or appellate; and Congress has repeatedly turned a deaf ear to its requests for such power.

It should not be given such jurisdiction by fiat of this Court. It should do what Congress intended it to do—upon determining that it has "reasonable cause to believe" that § 7 is being or has been violated, it should issue a complaint, hold a hearing, make a report, and issue an order. If exigencies require, it may refer the matter to the Attorney General for consideration as to whether the Department of Justice should seek a preliminary injunction in the appropriate district court.[8] If

---

available to the FTC is that such inaction confirms (a) that Congress in devising the statutory plan did not intend the Commission to have such power, and (b) that the relief sought is not consonant with the congressional plan for administering § 7. In fact, this is not a situation where the agency went to Congress in the belief that its authority was unclear, or to remove doubts concerning it. Compare *United States* v. *Speers,* 382 U. S. 266, 274–275; *United States* v. *du Pont & Co.,* 353 U. S. 586, 590; *Wong Yang Sung* v. *McGrath,* 339 U. S. 33, 47–48. Here, there is no doubt that the agency sought *additional* powers, not clarification. It admitted—it asserted—that it had no present authority to obtain preliminary relief (see Appendix to this opinion). It sought what it confessedly did not have. It sought this not once, but repeatedly, over a period of 10 years. Congress did not grant its request. Nor should we. See *Fribourg Navig. Co.* v. *Commissioner,* 383 U. S. 272, 279–286; *Blau* v. *Lehman,* 368 U. S. 403, 412–413.

[8] Spokesmen for the FTC have frequently acknowledged the availability of such a course. See, *e. g.,* Hearings before the Antitrust Subcommittee of the House Committee on the Judiciary, 87th Cong., 1st Sess., ser. No. 5, pp. 101–102 (testimony of Paul Rand Dixon) (1961); Kintner, The Federal Trade Commission in 1960—Apologia Prc Vita Nostra, 1961 Antitrust Law Symposium 21, 41.

The Commission also has on occasion successfully employed the technique of obtaining an agreement of the parties to segregate

the merger is consummated, the Commission should, if warranted, exercise the enormous power that the statute expressly gives it: to require the offender to "divest itself of the stock, or other share capital, or assets, held . . . contrary to the provisions" of § 7. It is a cliché of doubtful truth in this situation that an omelette cannot be unscrambled. This Court, as well as the Commission, has entered such orders of divestiture after—and sometimes long after—the merger has been consummated. See, e. g., United States v. Von's Grocery Co:, ante, p. 270 (decree six years after merger); United States v. El Paso Gas Co., 376 U. S. 651 (decree seven years after merger). Unscrambling may be difficult; but Congress may well have been justified in the view that the extra effort is warranted in the interests of securing what it hoped would be careful administrative consideration of the merits of proposed mergers. Not every merger deserves sudden death. In many situations, mergers serve no purpose except the pursuit of bigness. But some are distinctly beneficial to the achievement of a competitive economy.[9] I respectfully submit that this Court should not encourage the machinegun approach to the vastly important and difficult merger problem. It should indulge the Congress in its desire that at least the Federal Trade Commission should be required to move with caution and deliberation. A "preliminary" injunction, in effect during the years required to complete the Commission's proceedings, often—probably usually—means that

---

assets so as to facilitate divestiture should it be decreed. See, e. g., A. G. Spalding & Bros., Inc. v. F. T. C., 301 F. 2d 585, 588 (C. A. 3d Cir. 1962).

[9] For example, in some situations the merger of relatively small competitors may result in creation of an enterprise capable of meaningful competition with a company otherwise in unchallenged domination of an industry. See Brown Shoe Co. v. United States, 370 U. S. 294, 319, and legislative materials therein cited.

the plans to merge will be abandoned.[10]   We should not beguile ourselves by ignoring this point.   "Preliminary" here usually means final.   And I respectfully suggest that it is permissible for Congress to insist that the merits of mergers should be carefully considered.

I come now to the second phase of the Court's opinion. Having satisfied itself that the Commission may apply to the courts of appeals for preliminary injunctions, the Court turns to the question of the jurisdiction of the appellate courts to entertain such applications.   It finds jurisdiction in the courts of appeals by reason of the All Writs Act: "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."   28 U. S. C. § 1651 (a).

This is, in my opinion, a totally unjustified employment of the All Writs Act.   That Act is an implementing statute, designed to authorize the courts to supply deficiencies in procedure so as to enable them effectively to exercise their jurisdiction.   The Act is abused where, as here, it is contorted to confer jurisdiction where Congress has plainly withheld it.   The reason why this Court may not command or vindicate the exercise of jurisdiction by the courts of appeals to issue, as an original matter, injunctions against claimed violations of § 7 are overwhelming.   In summary, they are:

1. The courts of appeals have no jurisdiction with respect to § 7 except to review an order entered by the Commission after statutory proceedings.   Until such an order is entered, they have no jurisdiction, either existing or potential, which an injunctive order may implement.

---

[10] See  Kaysen  &  Turner,  Antitrust  Policy  248  (1959);  Note, 40 N. Y. U. L. Rev. 771, 772, n. 7 (1965), and cases cited therein.

2. By express statutory provision, even after a Commission order has been entered, the courts of appeals have no jurisdiction as to the merits of the merger, on application of the Commission. Only a party affected by the Commission's order may file a petition to review. If one does not, the Commission's sole remedy is to seek penalties in the district courts under 15 U. S. C. § 21 (*l*).[11]

3. The statute contains its own "all writs" provision which is clearly and specifically limited to instances in which the court of appeals' jurisdiction has already attached upon petition to review a Commission order filed by a person who is the target of that order.

4. There is not a single precedent of this Court which supports the Court's conclusion. None of the cases of this Court cited in the majority opinion lends it the slightest support.

5. Exclusive jurisdiction to issue preliminary injunctions against mergers is vested in the district courts, upon application of the Department of Justice or a private person. The courts of appeals have no jurisdiction to enter such orders.

6. The courts of appeals are not equipped to make the original, complex factual determinations necessary to decide whether a prospective merger should be enjoined. To burden them with this task is to distort their function; to saddle them with a function which they cannot perform; to load upon them the necessity of twice passing upon a challenged merger; and to deprive the parties of an opportunity for a hearing in a forum equipped to make original factual determinations.

---

The jurisdiction and powers of the courts of appeals with respect to Commission proceedings under § 7 are defined by the statute in specific and exhaustive detail.

---

[11] See note 3, *supra*.

A petition to review may be filed with an appropriate court of appeals by "[a]ny person required by [an] order of the commission" to cease or desist or to divest itself of stock or assets. 15 U. S. C. § 21 (c). The Court's jurisdiction attaches upon the filing of the petition, *ibid.*, and becomes exclusive upon filing of the record with it. 15 U. S. C. § 21 (d). The Commission's findings as to the facts are conclusive if supported by substantial evidence. 15 U. S. C. § 21 (c). If additional evidence is to be taken, the Court must remand to the Commission; it cannot itself take evidence. *Ibid.* The Court may affirm, modify or set aside the Commission's order. It may enforce the Commission's order as affirmed and may "issue such writs as are ancillary to its jurisdiction or are necessary in its judgment to prevent injury to the public or to competitors pendente lite." *Ibid.*

The Court does not—it could not—contend that these provisions lend the slightest support to its conclusion. They clearly, emphatically, and pointedly contradict it. The courts of appeals have jurisdiction when and if, and only if and when, a Commission order has been entered and a petition for review is filed—not by the Commission but by the aggrieved person.[12] When a petition for re-

---

[12] Indeed, there is no certainty that the particular court of appeals selected by the FTC on its application for preliminary relief will ever undertake to review an ultimate cease-and-desist order. Section 11 (c) of the Clayton Act, 15 U. S. C. § 21 (c), provides that a person against whom such an order is entered may appeal "in the court of appeals . . . for any circuit within which such violation occurred or within which such person resides or carries on business." In the present case, review of any final FTC order might lie not in the Court of Appeals for the Seventh Circuit, but in the Sixth or Eighth Circuit where both Dean and Bowman carry on business. See *Transamerica Corp.* v. *Board of Governors*, 206 F. 2d 163 (C. A. 3d Cir. 1953), cert. denied, 346 U. S. 901, setting aside an injunction issued by the Ninth Circuit; *A. G. Spalding & Bros., Inc.* v. *F. T. C.*, 301 F. 2d 585 (C. A. 3d Cir. 1962), enforcing an

view is filed, the court of appeals has "plenary" jurisdiction, implemented by the self-contained all-writs provision; and when the record is filed, that jurisdiction is exclusive. Prior to the entry of the Commission's order, the courts of appeals simply have no jurisdiction, existing or potential. The general All Writs Act is limited to writs "in aid of their respective jurisdictions." It is not a charter to be used at the behest of an administrative agency in order to supply it with a weapon which Congress has withheld. This is clear enough; and nothing in our prior decisions expands the meaning of the All Writs Act to cover the present situation.

The Court cites a number of cases to prove that an appeal need not have been perfected to call into play the power of the appellate courts to issue protective writs. This is clear and obvious as applied in those cases. Each of them involved issuance of a writ to prevent action or inaction by a trial court which would otherwise mean that the case would not be adjudicated on its merits and therefore could not be reviewed on appeal. The typical case involves the issuance of mandamus to the trial court to compel it to proceed with the adjudication of a pending case. In this category are the first three cases cited on the point by the Court.[13]

The fourth case cited by the Court clearly demonstrates the correct principle and the error of the Court's decision in the present case. In *Roche* v. *Evaporated Milk Assn.*, 319 U. S. 21 (1943), the respondent was

---

FTC order as to which an injunction unsuccessfully had been sought in the First Circuit seven years earlier.

[13] *Ex parte Crane,* 5 Pet. 190, 193; *Ex parte Bradstreet,* 7 Pet. 634; *McClellan* v. *Carland,* 217 U. S. 268. From its excerpt from *McClellan,* the Court omits the italicized portion: "[A] writ of mandamus may issue in aid of the appellate jurisdiction which might otherwise be defeated *by the unauthorized action of the court below."* 217 U. S., at 280.

indicted for price fixing. It filed a plea in abatement based upon an alleged fault in the authorization of the indictment. The District Court dismissed the plea. On application for a writ of mandamus, the Court of Appeals reversed, but this Court reversed the Court of Appeals because whatever might have been the merits of the District Court's dismissal of the plea in abatement, that dismissal did not defeat appellate jurisdiction. The District Court would proceed to adjudicate the merits of the case, and appellate jurisdiction would thereafter be available. The Court (per Chief Justice Stone) stated that "while a function of mandamus in aid of appellate jurisdiction is to remove obstacles to appeal, it may not appropriately be used merely as a substitute for the appeal procedure prescribed by the statute." *Id.*, at 26. The Court said that "The traditional use of the writ in aid of appellate jurisdiction . . . has been to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so." *Ibid.* Since the District Court was proceeding to adjudicate the case, and any error it might have committed would come to the appellate courts upon appeal, the Court held that the Court of Appeals erred in issuing the writ.

These decisions, therefore, are far from supporting the Court's decision in the present case. They are to the precise contrary. They demonstrate the obvious meaning of the language of the All Writs Act: that it is to be employed "in aid of" appellate jurisdiction—not to vest general restraining power in the courts of appeals, but to authorize them to overcome action or inaction which would prevent the case from proceeding to judgment and then to appellate review in the ordinary course. Nothing of the sort—nothing resembling it—appears in the present situation. The Commission may proceed with its hearings, as provided by statute. As provided by

statute, it may enter an order requiring respondents to divest themselves of the acquired assets. It may even—although I express no opinion on the issue—require action by the respondents, if they have irretrievably disposed of some or all of the assets, to take additional action to make available assets, customers, etc., for purchase by others so as to re-create a competitor, perhaps even if such action involves disposition of nonacquired assets.[14] And the appropriate court of appeals and this Court will have full, complete appellate jurisdiction with respect to its order.

The Court cites four of its prior decisions involving the availability of the All Writs Act in connection with administrative proceedings. These provide no assistance to it. First, it refers to *Arrow Transp. Co.* v. *Southern R. Co.*, 372 U. S. 658. This case is precisely *contra* to the Court's conclusion here. After a "brief and informal" hearing which led to a tentative conclusion that the increase was "unreasonable," the ICC suspended respondent's proposed rate increase and instituted a formal proceeding to adjudicate the reasonableness of the increase. The proceeding was still in progress when the maximum time provided by statute for suspension of the increase expired. Petitioner sued in the District Court, seeking an injunction pending the Commission's decision. This Court sustained denial of the injunction. It held that the Commission's jurisdiction was exclusive of any power in the courts to grant the relief, and that Congress' action in vesting power in the Commission left no latitude for court action even though it might mean that the small shipper could not continue in business under the higher rate. MR. JUSTICE BRENNAN, speaking for

---

[14] Compare *United States* v. *Aluminum Co. of America,* 247 F. Supp. 308, 316 (D. C. E. D. Mo. 1965), aff'd, 382 U. S. 12, with *Reynolds Metals Co.* v. *F. T. C.,* 114 U. S. App. D. C. 2, 309 F. 2d 223 (1962). See Duke, *op. cit. supra,* note 2.

the Court, observed, in words that are applicable here, that if the courts were to entertain petitioner's application for an injunction against the effectiveness of the rates pending Commission decision, they would in effect be prejudging the case and prejudicing administrative action. "[S]uch consideration," he said, "would create the hazard of forbidden judicial intrusion into the administrative domain." *Id.*, at 670. Correspondingly, I suggest that it is unlikely in the real world that if the Federal Trade Commission made representations to a court of appeals that a merger should be enjoined pending Commission proceedings, and if the court issued such an injunction, the Commission's ultimate determination would be uninfluenced by these powerful factors. I respectfully suggest that this is not a tolerable result.[15]

I come now to the case which the Court's opinion characterizes as "dispositive" of "this issue." *Whitney Bank v. New Orleans Bank,* 379 U. S. 411.[16] It is indeed a

---

[15] The Court's opinion today eschews the result in *Arrow Transportation* and fastens instead on footnote 22, 372 U. S., at 671, which merely reserves judgment as to "decisions which have recognized a limited judicial power to preserve the court's jurisdiction or maintain the *status quo* by injunction pending review of an agency's action through the prescribed statutory channels. . . ." The footnote adds that "[s]uch power has been deemed merely incidental to the courts' jurisdiction to review *final* agency action, and has *never* been recognized in derogation of such a clear congressional purpose to oust judicial power as that manifested in the Interstate Commerce Act." (Emphasis supplied.) The cases cited demonstrate the conventional use of the extraordinary writs referred to in the footnote. In *Scripps-Howard Radio, Inc.* v. *F. C. C.,* 316 U. S. 4, a stay was issued ancillary to an appeal already taken pursuant to statute. Its purpose was to suspend, pending action by the court in which the appeal was lodged, changes authorized by completed agency action. For the thoroughly conventional nature of *Transamerica,* also cited in the footnote, see note 1, *supra.*

[16] *Continental Ill. Nat. Bank* v. *Chicago, R. I. & P. R. Co.,* 294 U. S. 648, 675, cited by the Court in connection with its assertion

square holding on an issue that is not anywhere near the problem of this case. *Whitney* holds that a court of appeals may enter such orders as will protect its jurisdiction—*its jurisdiction having fully attached by a prior appeal from a final order of the Federal Reserve Board, in accordance with statute.* Briefly stated, the Federal Reserve Board had entered an order permitting a New Orleans bank to operate a subsidiary in Louisiana through a holding company. A petition to review that order was duly filed, pursuant to statute, in the Court of Appeals for the Fifth Circuit. While this was pending, Louisiana enacted a statute bearing on the problem. Meanwhile, the Comptroller of the Currency indicated that he would issue a certificate to the new bank. Competing banks filed in the District Court for the District of Columbia an action for injunction against the Comptroller. The injunction was granted and the Court of Appeals for the District of Columbia Circuit affirmed. It was the latter action that was before this Court, on certiorari. This Court held that the District Court had no jurisdiction to pass on the merits of the controversy by enjoining the Comptroller; that exclusive jurisdiction as to the authorization of the new bank was vested in the Federal Reserve Board. But it stayed its mandate for 60 days to give the parties time to move in the Fifth Circuit for a remand to the Federal Reserve Board for reconsideration of its order in light of the subsequent Louisiana statute. On remand, the Court stated, "the Fifth Circuit's power to protect its jurisdiction is beyond question," *id.,* at 426—this in a case which had been in the Court of Appeals for three years following final agency action.

---

that courts have power to preserve the *status quo* while administrative proceedings are in progress, relates instead to the power of a bankruptcy court to enjoin the sale of collateral- pledged by a debtor.

This is entirely in accord with the traditional and established construction of the All Writs Act, and with the statute governing proceedings of the Federal Reserve Board. Jurisdiction had properly been acquired by the Court of Appeals for the Fifth Circuit. Of course, it had power to issue whatever orders were necessary to preserve its jurisdiction, pending remand or otherwise. The Court's statement that it is "analogous" to the relief requested by the Commission is simply in error. It is analogous only if we disregard the facts that in *Whitney*, a final order had been entered by the administrative agency, appeal taken and the jurisdiction of the Court of Appeals had attached. Whereas in the present case none of these has occurred and we are bluntly asked to vest the courts of appeals with authority to consider issuing an injunction as a matter of original jurisdiction— without an agency order, without an appeal, and without statutory jurisdiction.

The net of the matter is simply, plainly and clearly that the decision of the Court in this case is novel— totally novel. It is in direct contravention of the careful, specific plan and directions of the Congress with respect to the administration of § 7 of the Clayton Act. It is in direct conflict with the purpose and office of the All Writs Act. It is totally unsupported by prior decisions of this Court and contrary to both *Roche, supra,* and *Arrow Transportation, supra.* It is unwise in terms of the administration of § 7. It places an unwise, unjustified and disruptive burden on the courts of appeals and saddles them with original jurisdiction which they cannot properly exercise and a fact-finding function in elaborate, complex situations, which they should not be asked to undertake.

The courts of appeals are not courts of original jurisdiction. They have neither the facilities nor the institutional aptitude for determining in the first instance

whether a particular merger should be halted. This is always intensely a question of fact—hotly controverted—turning upon factual-economic problems such as the ascertainment of facts as to the "line of commerce," the "section of the country" and the probable effect upon competition. And these are questions committed in the first instance to the FTC and not to the courts. See *Whitney Bank* v. *New Orleans Bank, supra,* at 421.

Without any findings of the Commission or a court, the courts of appeals are now burdened with the task of deciding these questions. The fact of the matter is that the Court's decision commands the courts of appeals to be trial courts for purposes of those § 7 cases which the Commission chooses to bring before them. I share the view expressed by my Brother BLACK and joined by my Brother DOUGLAS that:

> "The business of trial courts is to try cases. That of appellate courts is to review the records of cases coming from trial courts below. In my judgment it is bad for appellate courts to be compelled to interrupt and delay their pressing appellate duties in order to hear and adjudicate cases which trial courts have been specially created to handle as a part of their daily work." *United States* v. *Barnett,* 376 U. S. 681, 724 (dissenting opinion).

Yet the responsibility today imposed upon appellate courts requires them to try cases. This is precisely what is required in determining whether a merger should be restrained during the years required to complete an FTC hearing on the merits.[17] Frequently, perhaps gen-

---

[17] The Commission's estimate in the present case that its proceedings would endure for at least one year seems unprecedentedly optimistic. In *A. G. Spalding & Bros., Inc.* v. *F. T. C.,* 301 F. 2d 585 (C. A. 3d Cir. 1962), where the FTC unsuccessfully sought an injunction *pendente lite,* more than seven years elapsed between complaint and enforcement. *Pillsbury Mills, Inc.* (FTC Docket

erally, to enjoin a merger "temporarily" is equivalent to entering a final order. The financial and commercial commitments involved in an agreement to acquire or to merge are apt to be so restrictive of the managerial flexibility of the parties, and so dependent upon transient circumstances, that they cannot be maintained in limbo while an FTC proceeding wends its leisurely way toward a wearying conclusion. Because the result of the application for temporary relief may be conclusive for all time, there is a discernible and understandable tendency on the part of the parties to put in a full case.[18]

Few § 7 cases are so simple that summary treatment is appropriate. See, e. g., United States v. Bethlehem Steel Corp., 157 F. Supp. 877, 879 (summary judgment denied), 168 F. Supp. 576 (D. C. S. D. N. Y. 1958) (merger enjoined after full factual hearing). The risk involved in deciding an application for "preliminary" injunction on affidavits is so great that to invite it, as the Court here does, is to invite the administration of justice which is rough and ready, to say the least. On the other hand, to impel the courts of appeals to take testimony in these cases is an anomaly that should not be tolerated.

---

No. 6000) was in the Commission for eight and one-half years; Crown Zellerbach Corp. v. F. T. C., 296 F. 2d 800 (C. A. 9th Cir. 1961), for nearly four years, and it was another four years before the Commission's order was affirmed. These delays were not unknown to Congress. See Hearings before the Antitrust Subcommittee of the House Committee on the Judiciary, 87th Cong., 1st Sess., ser. No. 5, p. 86 (1961).

[18] See United States v. Ingersoll-Rand Co., 218 F. Supp. 530 (D. C. W. D. Pa.), aff'd, 320 F. 2d 509 (C. A. 3d Cir. 1963), where the hearing on an application for preliminary relief took five days. See also United States v. FMC Corp., 218 F. Supp. 817 (D. C. N. D. Cal.), appeal dismissed, 321 F. 2d 534 (C. A. 9th Cir.), application for preliminary injunction denied, 84 Sup. Ct. 4 (1963) (Goldberg, J., in chambers).

This Court has recognized that there is no quick and easy, short and simple way to resolve the complexities of most antitrust litigation. In *White Motor Co.* v. *United States,* 372 U. S. 253, the Court reversed summary judgment for the Government. It held that summary judgment was inappropriate and a trial should be had with respect to the Government's charge of illegal vertical territorial limitations. It specifically relied upon the "analogy from the merger field that leads us to conclude that a trial should be had." *Id.,* at 263. The Court said (per DOUGLAS, J.) that in cases "involving the question whether a particular merger will tend 'substantially to lessen competition' " or whether "the acquired company was a failing one," "a trial rather than the use of the summary judgment is normally necessary." *Id.,* at 264. See also *United States* v. *Diebold, Inc.,* 369 U. S. 654, where factual issues paralleling those in the present case were held unsuitable for summary judgment.

Similarly, in *La Buy* v. *Howes Leather Co.,* 352 U. S. 249, this Court refused to permit reference of antitrust cases to a master. It held (per CLARK, J.) that "most litigation in the antitrust field is complex," and that this is "an impelling reason for trial before a regular, experienced trial judge" rather than a master. *Id.,* at 259.

By its decision today, however, this Court commands that these admittedly difficult, complex cases be heard and adjudicated by the courts of appeals on original applications for "temporary" injunctions. I cannot reconcile this result with the facts, with this Court's awareness of the complexity of the task, or with proper regard for the courts of appeals. Apart from the judicial problem which this invention creates, we must recognize that the interposition of the courts, without congressional direction, at the threshold of the administrative process

is contrary to the congressional plan and the reiterated holdings of this Court. As the Court said in *Arrow Transportation, supra,* judicial "consideration," prior to final administrative adjudication, "would create the hazard of forbidden judicial intrusion into the administrative domain." 372 U. S., at 670. This Court's insistence upon the "primary jurisdiction" of administrative agencies illustrates its sensitivity to the point. The Court has even insisted that "Dismissal of antitrust suits, where an administrative remedy has superseded the judicial one, is the usual course." *Pan American World Airways* v. *United States,* 371 U. S. 296, 313, n. 19; see also *United States* v. *Western Pac. R. Co.,* 352 U. S. 59; *Far East Conference* v. *United States,* 342 U. S. 570; *United States Nav. Co.* v. *Cunard S. S. Co.,* 284 U. S. 474.

The present case illustrates the profound difficulties that the Court of Appeals will face in reaching a decision, within the practical limits of its available time and procedures, as to whether it should issue a "preliminary" injunction. There are here sharp factual disputes concerning the financial status of Bowman and the availability to it of the so-called "failing company" defense. There is a claim that Dean Foods is about to lose its largest customer and that as a result the merged company will be smaller than Bowman was before the merger. And the bona fides of the "interested" prospective purchaser uncovered by the Commission's staff is in dispute.

The Court of Appeals will have to make a judgment concerning these issues, as well as the other, complex factors that are determinative. It will get little comfort from the label of the relief sought as "preliminary" because it will know that the patient may die while the "temporary" anesthesia is in effect. And it will know that, realistically, it has no control over the length of the proceedings—whether the Commission's hearings will

last a year or eight years, or something in between. By contrast, when the Department of Justice or a private person seeks a "preliminary" injunction in a district court, as provided by statute, the proceedings on the merits are in the same court. That court controls the proceedings, and it is admonished by the statute to proceed "as soon as may be, to the hearing and determination of the case." 15 U. S. C. § 25. This is an essential admonition, insisted upon by the Congress to mitigate the consequences of preliminary restraints imposed by the district courts upon effectuation of mergers. The courts of appeals will be in the unhappy position of either attempting to supervise Commission proceedings in the predictably vain effort to secure expedition, or accepting the fact that the "preliminariness" of their order is totally subject to the destructive delays characteristic of Commission procedures. See Kaysen & Turner, Antitrust Policy 248–249 (1959).

In effect, today's decision represents radical surgery upon the administration of § 7 of the Clayton Act. This is done contrary to statute, without basis in law or precedent, and is motivated by reasons, which while they may have superficial appeal, are unwise and disruptive. In effect, the Court condones and encourages the Commission to turn aside from its designated function as an expert, administrative agency to become a prosecutor and litigant.

When the Commission was established in 1914, it was not intended to duplicate the functions of existing agencies, but rather to bring to bear on the problems of antitrust and unfair competition the "specialized knowledge and expert judgment, continuity of experience and political independence, flexible procedures and efficient fact-finding methods—[hopefully] characteristic of the administrative process." Elman, Rulemaking Procedures

in the FTC's Enforcement of the Merger Law, 78 Harv. L. Rev. 385, 387 (1964).

Every conceivable merger case involves the danger that the merger, unless enjoined, will be effectuated, and the incentive to the Commission to shop among the statutorily available courts of appeals and to seek "preliminary" injunctions will be great. This, I repeat, is a radical change from the pattern that Congress has ordered, and one which is profoundly undesirable in its effects upon the parties, the courts of appeals, and upon the national interest in a careful assessment of mergers for the purpose of tolerating those which are permissible and liquidating those which violate the national policy expressed in § 7.

I would affirm the decision below.

## APPENDIX TO OPINION OF MR. JUSTICE FORTAS, DISSENTING.

The FTC first solicited the assistance of Congress in 1956. In January of that year it submitted to the appropriate committees of the Eighty-fourth Congress a staff study containing various legislative proposals. The study observed that "A very serious loophole in the Antimerger Act [§ 7] is the lack of a provision which enables the Federal Trade Commission either to take action to prevent mergers prior to consummation or, after consummation, to take action to preserve the status quo until completion of administrative proceedings before the Commission." [1]

The study informed the committees that in 1955 the FTC had twice sought to secure preliminary injunctions from courts of appeals, but that the courts had found

---

[1] Hearings before the Antitrust Subcommittee of the House Committee on the Judiciary, 84th Cong., 2d Sess., ser. No. 15, p. 29 (1956).

no basis in existing law to authorize such applications.[2] In hearings conducted upon proposals of the FTC and others, the Commission through its then chairman, John W. Gwynne, urged Congress to enact legislation which would empower it in § 7 cases to apply to United States District Courts for preliminary relief.[3] Chairman Gwynne was pessimistic about the prospects for success under the all-writs statute, noting that it "is a very general statute and is designed to protect not the jurisdiction of the Federal Trade Commission but the jurisdiction of the circuit court of appeals to which the case might finally get." [4]

Both Senate and House Judiciary Committees accepted the view, repeatedly stated by spokesmen for the FTC,

---

[2] The cases referred to were *Federal Trade Comm'n v. Farm Journal, Inc.* (C. A. 3d Cir. 1955) (unreported); and *In the Matter of A. G. Spalding & Bros., Inc.* (C. A. 1st Cir. 1955) (unreported). They are discussed in H. R. Rep. No. 486, 85th Cong., 1st Sess., 8–9 (1957); Hearings before the Subcommittee on Antitrust and Monopoly of the Senate Committee on the Judiciary on S. 198, S. 721, S. 722 and S. 3479, 85th Cong., 2d Sess., 42–45 (testimony of FTC Chairman Gwynne), 156–157 (testimony of Congressman Celler) (1958).

[3] The FTC proposed that § 11 of the Clayton Act be amended to read: "Whenever the Federal Trade Commission has reason to believe—

"(1) That any corporation is acquiring, has acquired or is about to acquire the stock or assets of another corporation in violation of the provisions of section 7 of this Act, and

"(2) That the enjoining thereof pending the issuance of a complaint by the Commission under this section and until such complaint is dismissed by the Commission or set aside by the court on review, would be to the interest of the public,

"the Commission . . . may bring suit in a district court of the United States . . . to prevent and restrain violation of section 7 of this Act. Upon proper showing a temporary injunction or restraining order shall be granted without bond. . . ." Hearings, *supra,* note 1, at 29–30.

[4] *Id.,* at 35.

that it lacked any authority to enjoin or seek a court order to enjoin mergers prior to an FTC adjudication of their illegality, and that this gap in the Commission's arsenal was crippling its efforts to enforce § 7. Both Committees reported out H. R. 9424, which contained an amendment to § 15 of the Clayton Act authorizing the FTC to seek preliminary relief in the United States District Courts. S. Rep. No. 2817, 84th Cong., 2d Sess. (1956); H. R. Rep. No. 1889, 84th Cong., 2d Sess. (1956).[5] The bill passed the House, but failed of passage in the Senate.

Similar legislative proposals have been introduced in subsequent sessions, but always with less success than in 1956. In all of these legislative proceedings, the position of the FTC has been steadfast: consistently, it has insisted that without new legislation it lacks authority to enjoin mergers pending completion of agency action. In March of 1957, FTC Chairman Gwynne informed the appropriate Committees of the decision in *Federal Trade Comm'n* v. *International Paper Co.*, 241 F. 2d 372 (C. A. 2d Cir. 1956), that the all-writs statute would not support an FTC application for preliminary relief. To the House Committee he forwarded a copy of the opinion, describing it as "[e]ven more conclusive" than the earlier unreported decisions of the Courts of Appeals for the First and Third Circuits.[6] In the Senate, Chairman Gwynne characterized his Commission's application in *International Paper* as "something of a forlorn hope."[7] When Senator Kefauver, the Committee Chairman, asked him whether the FTC had sought

---

[5] H. R. 9424, although worded in greater detail, was in substance like the FTC proposal.

[6] Letter to Chairman Celler, in Hearings before the Antitrust Subcommittee of the House Committee on the Judiciary, 85th Cong., 1st Sess., ser. No. 2, p. 103 (1957).

[7] Hearings, *supra*, note 2, at 45.

review of the decision in this Court, Chairman Gwynne answered: "No, we did not. We talked that over. I could not help but agree with the court, frankly. I think the remedy is to amend the law. . . ." The Senator replied, "I think you are right about it." [8]

Nor was Gwynne the only FTC spokesman to represent to Congress that legislation was essential if the Commission, like the Department of Justice and private parties, was to be able to maintain the *status quo* pending determination of a merger's legality. The present chairman, Paul Rand Dixon, who as committee counsel had participated in Senate proceedings on this matter since 1956, informed the Eighty-seventh Congress that "It is clear that the Commission has no such authority," citing *International Paper*.[9] Leading Members of Congress [10] and key representatives of the Executive Branch [11] expressed the same view.

A third FTC Chairman, Earl Kintner, explained to the bar rather than directly to Congress, that in 1960 the FTC had intervened as *amicus curiae* in a private suit to enjoin a merger,[12] which suit paralleled a pending

---

[8] *Ibid.*

[9] Hearings before the Antitrust Subcommittee of the House Committee on the Judiciary, 87th Cong., 1st Sess., ser. No. 5, pp. 87, 107 (1961). It was in this session that the FTC abandoned its prior advocacy of proposals that it seek relief in the district courts, urging instead that it be given power to issue its own injunctions and restraining orders. *Id.,* at 88, 91. Compare testimony of FTC Chairman Gwynne, Hearings, *supra,* note 2, at 49–59.

[10] See, *e. g.,* statement of Congressman Celler, Hearings, *supra,* note 2, at 156–160; statement of Congressman Patman, Hearings, *supra,* note 9, at 45; statement of Senator Kefauver, *id.,* at 46.

[11] *E. g.,* The President's Economic Report, submitted to Congress on January 23, 1957, p. 51; Letter from Attorney General Kennedy, May 2, 1961, in Hearings, *supra,* note 9, at 58.

[12] *Briggs Mfg. Co.* v. *Crane Co.,* 185 F. Supp. 177 (D. C. E. D. Mich.), aff'd, 280 F. 2d 747 (C. A. 6th Cir. 1960).

Commission inquiry. This was done, he said, because the FTC was "[l]acking any statutory authority to seek a temporary injunction." Kintner, The Federal Trade Commission in 1960—Apologia Pro Vita Nostra, 1961 Antitrust Law Symposium 21, 38. He noted that the FTC was pressing for legislative authorization, and that until the effort succeeded the FTC would be confined to intervention in occasional private suits and to reliance upon the Justice Department "where a temporary restraining order is peculiarly appropriate." *Id.*, at 41.[13]

---

[13] FTC Chairman Dixon utilized the same forum the following year to plead for legislation which would authorize the Commission to issue its own temporary relief. See Dixon, The Federal Trade Commission in 1961, 1962 Antitrust Law Symposium 16, 19–21.