782 F.2d 112
 PACKARD ELEVATOR, Farmers Cooperative Society, Incorporated,
Farmers Cooperative Elevator (Marble Rock, IA), Farmers Coop
Elevator (LaPorte City, IA), Farmers Coop Elevator (Manly,
IA), Shell Rock Elevator Company, Gilbertville Milling
Company, Mount Auburn Grain Company, Vinton Coop, Rock Falls
Grain Company, and Iowa Northern Railway Company, Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents.
 No. 85-2517.
 United States Court of Appeals,
Eighth Circuit.
 Jan. 17, 1986.
 
 Before McMILLIAN, JOHN R. GIBSON and FAGG, Circuit Judges.
 McMILLIAN, Circuit Judge.
 
 
 1
 Petitioners Packard Elevator, Farmers Cooperative Society, Inc., Farmers Cooperative Elevator (Marble Rock, IA), Farmers Coop Elevator (LaPorte City, IA), Farmers Coop Elevator (Manly, IA), Shell Rock Elevator Co., Gilbertville Milling Co., Mount Auburn Grain Co., Vinton Coop, Rock Falls Grain Co., and Iowa Northern Railway Co. (IANR), moved this court for a stay pending judicial review of a decision of the Interstate Commerce Commission (ICC or the Commission). Chicago Central & Pacific R.R.--Purchase (Portion), Trackage Rights, & Securities Exemption, Finance Docket No. 30663 (Dec. 24, 1985) (ICC decision). The court granted a temporary stay on December 24, 1985. On December 27, 1985, following oral argument by telephone conference call, we vacated the temporary stay, denied the motion for stay pending judicial review, and expedited the appeal and briefing process. We also granted the motion of Mr. Patrick W. Simmons for leave to intervene. Packard Elevator v. ICC, No. 85-2517 (8th Cir. Dec. 27, 1985) (order).
 
 
 2
 Due to the emergency nature of the stay proceedings and the holiday season, an order only was entered on December 27, 1985. In this opinion we set forth our reasons for denying the motion for a stay pending judicial review.
 
 
 3
 Illinois Central Gulf Railroad Co. (ICG) is a class I rail carrier which provides service primarily between the Midwest and Gulf Coast. Over the past several years, as part of a program to make its system more efficient, ICG has been selling rail lines to smaller carriers. Smaller carriers are subject to fewer operating constraints than class I carriers and are able to operate the lines with greater efficiency. In April 1985 ICG agreed to sell a 679-mile rail line ("Iowa line") and incidental trackage rights to the Chicago, Central & Pacific Railroad Co. (CCPR). The Iowa line runs 510 miles from Chicago to Omaha, with a 128-mile branch from Tara to Sioux City, IA, and a 41-mile branch from Manchester to Cedar Rapids, IA. CCPR is a noncarrier corporation which was formed to accquire and operate the Iowa line.
 
 
 4
 In May 1985 CCPR filed a petition with the ICC seeking certain exemptions from regulation pursuant to 49 U.S.C. Sec. 10505(a) (1982) from the requirements of 49 U.S.C. Sec. 10901 (1982) to permit it to acquire the Iowa line from ICG and from the requirements of 49 U.S.C. Sec. 11301 (1982) to permit it to issue securities. CCPR's president, John E. Haley, holds qualifying shares of CCPR common stock. Haley also owns a majority of the stock of the Cedar Valley Railroad Co. (CVR), a class III rail carrier operating a north-south line in Minnesota and Iowa that intersects the Iowa line at Waterloo, Iowa. In June 1985 Haley placed his CVR stock in a voting trust pursuant to 49 C.F.R. Part 1013.
 
 
 5
 Petitioners, except IANR, own and operate grain elevators in northeastern Iowa and are served by IANR. IANR is a class III rail carrier and is owned by these grain elevators. IANR owns and operates a 144-mile north-south rail line between Manly and Cedar Rapids, IA, which intersects the Iowa line at Waterloo, IA. The IANR segment north of Waterloo lies about 15 miles west of the CVR line and competes directly with CVR. IANR acquired the line from the Trustee of the Chicago, Rock Island & Pacific Railroad Co. in 1984.
 
 
 6
 IANR filed a protest against CCPR's petition for exemption and the ICC instituted an investigation. Two shippers' associations, the Northeast Iowa Shippers Association and the Shell Rock Valley Shippers Association, and other parties, including labor organizations and several individual shippers, also filed protests. On December 11, 1985, after further administrative proceedings, the ICC voted in an open conference to grant CCPR's petition for exemption without conditions. However, the ICC decision was not issued until the morning of December 24, 1985.
 
 
 7
 The ICC upheld the validity of Haley's placement of his CVR stock in a voting trust and found no merit in the allegations that Haley nonetheless continued to exercise control over CVR. ICC decision, slip op. at 5. The ICC also found that the record did not establish that the shippers had experienced or would be likely to experience any abuse of market power, such as predatory pricing, as a result of the acquisition of the Iowa line by CCPR because of intense truck competition and the availability of alternative rail connections for river traffic. Id. at 8. Finally, pursuant to 49 U.S.C. Sec. 10505(a), the ICC exempted the transaction from the requirements of 49 U.S.C. Sec. 10901 because continued regulation was not necessary to carry out the national rail transportation policy set forth in 49 U.S.C. Sec. 10101a (1982) and regulation was not necessary to protect shippers from abuse of market power. Id. at 8-11.
 
 
 8
 CCPR and ICG argued in the stay proceedings before this court that the ICC decision was effective immediately. Certainly CCPR and ICG acted on that basis by closing their transaction and transferring possession of the property and operations within several hours of service of the ICC decision. Petitioners also acted promptly after service of the ICC decision by immediately seeking a temporary stay of the ICC decision. We granted a temporary stay during the afternoon of December 24, 1985. CCPR and ICG argue that the issue of injunctive relief is moot because at the time they were notified of the court's temporary stay, possession and operation of the Iowa line had already been transferred from ICG to CCPR.
 
 
 9
 We believe that petitioners' motion for a stay is not moot even though ICG has already transferred possession and operation of the Iowa line to CCPR. Although injunctive relief may have been sought too late to enjoin the acquisition itself,[1] what is in dispute between these parties is the manner in which the Iowa line is to be operated, in particular whether the rates established by ICG will remain in effect. Appropriate injunctive relief could have been entered to preserve the operational status quo even after the transfer of ownership and possession. Moreover, revocation of the exemption of the acquisition from regulation, which could require CCPR to divest itself of the Iowa line, is a remedial possibility. 49 U.S.C. Sec. 10505(d).
 
 
 10
 The factors to be considered in granting a stay pending judicial review are essentially those factors considered in granting preliminary injunctive relief. E.g., Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109, 114 (8th Cir.1981) (banc).
 
 
 11
 The party seeking a stay pending [judicial review] must show (1) that it is likely to succeed on the merits; (2) that it will suffer irreparable injury unless the stay is granted; (3) that no substantial harm will come to other interested parties; and (4) that the stay will do no harm to the public interest.
 
 
 12
 James River Flood Control Ass'n v. Watt, 680 F.2d 543, 544 (8th Cir.1982) (order) (per curiam) (stay pending appeal of preliminary injunction); accord Wisconsin Gas Co. v. FERC, 758 F.2d 669, 673-74 (D.C.Cir.1985) (per curiam) (stay pending judicial review of agency order). In the present case we must deny the stay because petitioners have failed to establish the second factor: that they will suffer irreparable harm unless the stay is granted. For the reasons set forth below, we conclude petitioners' allegations of irreparable harm are speculative and unsubstantiated by the record.
 
 
 13
 "The basis for injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." ...
 
 
 14
 First, the injury must be both certain and great; it must be actual and not theoretical. Injunctive relief "will not be granted against something merely feared as liable to occur at some indefinite time"; the party seeking injunctive relief must show that "[t]he injury complained of [is] of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm."
 
 
 15
 It is also well settled that economic loss does not, in and of itself, constitute irreparable harm.... Recoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the [petitioner]'s business.
 
 
 16
 Implicit in each of these principles is the further requirement that the [petitioner] substantiate the claim that irreparable injury is "likely" to occur. Bare allegations of what is likely to occur are of no value since the court must decide whether the harm will in fact occur. The [petitioner] must provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future. Further, the [petitioner] must show that the alleged harm will directly result from the action which the [petitioner] seeks to enjoin.
 
 
 17
 Id. at 674 (citations omitted; emphasis original in authorities cited).
 
 
 18
 Petitioners allege that, CCPR will engage in predatory pricing of grain transportation service. Petitioners premise this allegation on their past experience with CVR, which had been acquired earlier by Haley and which petitioners assert has a history of establishing grain rates below variable costs. Petitioners assert that CVR's below-cost grain rates enabled their CVR-serviced competitors to offer farmers marginally higher grain prices. Farmers who would normally have sold their grain to petitioners bypassed petitioners' elevators in favor of their CVR-serviced competitors. In response to CVR's predatory pricing, petitioners were forced to reduce their profit margins to levels even with or below their long-term fixed costs of operation in order to compete. Petitioners argue that, in the absence of a stay, CCPR, like CVR, will engage in predatory pricing, more farmers will bypass their elevators, and they will be forced out of business. Petitioners submitted several affidavits in support of their allegations.
 
 
 19
 First, petitioners' underlying premise that CVR engaged in predatory pricing is unsubstantiated, notwithstanding petitioners' affidavits to the contrary. A similar predatory pricing claim was rejected by the ICC in the proceedings below. The ICC found that
 
 
 20
 80 percent of Iowa's grain that moves to the Mississippi River ports moves by truck. Based on this intense truck competition and the availability to IANR of alternative rail connections for river traffic, a competitor cannot price predatorily (i.e., reduce prices to eliminate competition, and then raise prices to monopoly levels). Moreover, the record does not establish that any predatory pricing actually has occurred or will occur with or without common control of CCP[R] and CV[R]. That CV[R] expenses exceeded revenues during its first few months of operation clearly does not establish a case for predatory pricing as claimed by IANR.
 
 
 21
 ICC decision, slip op. at 8.
 
 
 22
 In addition, petitioners' allegation that CCPR will adopt CVR's pricing policy is speculative. Even if petitioners had established that CVR set predatory prices in the past, petitioners would have shown only that CVR, not CCPR, was likely to do so again.[2]
 
 
 23
 Petitioners have not established that they will suffer irreparable injury unless a stay is granted. Accordingly, their motion for a stay pending judicial review is denied. We express no opinion on the merits of the petition for judicial review.
 
 
 
 [1]
 See FTC v. Dean Foods Co., 384 U.S. 597, 599-605, 86 S.Ct. 1738, 1740-43, 16 L.Ed.2d 802 (1966) (court of appeals has jurisdiction to issue preliminary injunction to prevent merger pending review of agency action upon showing that effective remedial order would otherwise be virtually impossible once merger was implemented, thus rendering a final divestiture decree futile)
 
 
 [2]
 We note that even rail carriers exempted from regulation pursuant to 49 U.S.C. Sec. 10505(a) may not establish transportation rates "below a reasonable minimum." 49 U.S.C. Sec. 10701a(c)(1) (1982). "Any rate for transportation by ... a rail carrier [subject to the jurisdiction of the ICC under subchapter 1 of chapter 105 of this title] that does not contribute to the going concern value of such carrier is presumed not to be reasonable. A rate that contributes to the going concern value of such carrier is conclusively presumed not to be below a reasonable minimum." Id. "A rate for transportation by a rail carrier that equals or exceeds the variable cost of providing the transportation is conclusively presumed to contribute to the going concern of such rail carrier." Id. Sec. 10701a(c)(2). Prompt action upon complaints alleging unreasonable rates is required. Id. Sec. 10701a(c)(3)(A) (final ICC action within 90 days of filing of complaint)